**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSEPHINE EDU,
                                    *Petitioner,*

              v.

ERIC H. HOLDER Jr., Attorney
General,
                                    *Respondent.*

No. 06-72609

Agency No.
A043-358-010

JOSEPHINE EDU,
                                    *Petitioner,*

              v.

ERIC H. HOLDER Jr., Attorney
General,
                                    *Respondent.*

No. 07-70590

Agency No.
A043-358-010

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 5, 2010—San Francisco, California

Filed October 26, 2010

Before: Ferdinand F. Fernandez and Barry G. Silverman,
Circuit Judges, and Kevin Thomas Duffy,* District Judge.

Opinion by Judge Fernandez

*The Honorable Kevin Thomas Duffy, United States District Judge for
the Southern District of New York, sitting by designation.

17705

## COUNSEL

César R. Ternieden, Law Office of César R. Ternieden, San Francisco, California; Charles E. Nichol, Law Offices of Charles E. Nichol, San Francisco, California for the petitioner.

Liza Murcia, United States Department of Justice, Civil Division, Washington, D.C., for the respondent.

## OPINION

FERNANDEZ, Circuit Judge:

Josephine Edu, a native and citizen of Nigeria, petitions for review of the Board of Immigration Appeals' (BIA) denial of her application for deferral of removal under the Convention Against Torture[1] (CAT), and from its denial of her motion to reopen. Deferral was denied on the basis that Edu could avoid torture by ceasing to exercise her political rights, and that the mere fact that she had endured female genital mutilation was insufficient to support CAT relief. We grant her petition in part and remand.

## BACKGROUND

Josephine Edu is a forty-seven-year-old woman from Nigeria. She is a member of the Ijaw (or Ijall) tribe which is concentrated in the Niger Delta area. She entered the United States in December 1989, and became a lawful permanent resident on January 7, 1993, after marrying her United States citizen husband. On April 10, 2002, she was issued a notice to appear by the Department of Homeland Security because she had been convicted of an aggravated felony.[2] She conceded removability on that basis, but submitted an application for deferral of removal under CAT.

Edu grew up in Lagos, Benin City and Potakot (that is, Port Harcourt). Those are within the Niger Delta region. She studied to be a nurse and midwife from 1982 to 1987 in Benin City. In November 1983, while at the university, she became

---

[1]United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted* Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85 (implemented at 8 C.F.R. § 208.18).

[2]She had been convicted of assault with a deadly weapon in California after she used a piece of glass to stab and slash her supervisor.

politically active by joining the Ijaw Youth Association, a group of nurses and doctors. The purpose of the group was to protest against the government's failure to provide jobs to minority graduates, and its failure to provide roads, good schools, drinking water, lights, and payment of student loans and salaries. Edu took on secretarial duties for the Association, which included taking memos, contributing money, and writing letters to politicians and younger military officers to discuss the Association's concerns. In addition, Edu participated in several demonstrations.

Edu testified to incidents where she was detained, raped and beaten by the police or military in response to her political activities. First, in November 1983, during her second or third peaceful demonstration outside the governor's office, the police and military arrived. The police beat and pushed the protestors. Edu fell and cut her legs on pieces of glass. After that, she began demonstrating more. A few days later, she was arrested after demonstrating for four hours. She was taken to the barracks where she was raped by two officers in an interrogation room. She was a virgin at the time of that assault, and became pregnant as a result of it. Her mother made her abort the child.

Thereafter, Edu did not demonstrate for several months because she was scared and ill. However, in April of 1994, while on vacation at her uncle's home in Potakot, she joined her cousins in a demonstration. This time she demonstrated for two hours before she was arrested by the military. Those officers beat her with a baton, and sexually assaulted her in her cell. After that incident, Edu did not demonstrate because her father threatened to prevent her from graduating and to cut off her allowance. However, she continued her secretarial duties for the Association.

After Edu finished her nursing education, she was unable to find a job. She felt she had nothing to live for and participated in demonstrations several times. In February 1987, she

was arrested again and detained. She was beaten with a baton and a whip. In addition, she was raped by military officers in their mess hall. Those officers were different from the ones who had assaulted her the first time. Following this rape, she, again, abstained from demonstrating for four to five months, but did continue to participate in meetings. Then, she began protesting again because she "want[ed] the world to know what [she] was going through." At her next demonstration, the media was present and she was photographed "in front of [a] hospital with a banner" and medical file in her hands. A politician used her image in advertisements for his campaign to depict student discontent with his opponent. The advertisement was shown on television and published in newspapers.

In December 1987, Edu was again arrested while demonstrating. Two military officers grabbed her, beat her, and then took her to a "top ranking military officer's office." The other men left her alone with that officer. He informed Edu that he recognized her from the politician's commercials and asked her if she had been modeling for him. When she replied that she was standing up for her beliefs and protesting for change, the officer told her that he would "show [her] how to be tough;" that he would beat her and shut her mouth. He then whipped her with his belt and beat her with his baton, which caused her to pass out and bleed from her head. She awoke to see the officer cutting off her underwear, and slicing her thigh in the process. She was bleeding from her head, shoulder and thigh at that point. The officer then raped her. Afterwards, he instructed his subordinates to dump her body at the hospital. She felt she was going to be killed that day, for it was the most serious harm she had suffered.

Although Edu complained to the police after each of those incidents, nothing ever happened. Indeed, her own family told her that she deserved the abuse because women should not demonstrate. Thereafter, she did not demonstrate but continued to participate in meetings.

After the last incident, Edu left Benin City for Lagos where she worked in a private hospital from 1988 to 1989. She lived with her uncle, who owned a security company, at that time. While in Lagos, she did not have any problems with the military. She "was planning to come [to the United States] and . . . [kept] a low profile so [she] could get out safely." While in the United States, she sent money to the Ijaw Association in Nigeria in order to support their rallies and protests. She did return to Nigeria in December 1992 to obtain her lawful permanent residency documents. She remained there for four weeks, however her family was frightened for her life because her cousins had recently been killed in Potakot while demonstrating. Her uncle also feared for his own life because she was staying with him. Thus, her uncle "compelled [her] to remain indoors" and escorted her to and from the American Embassy. While in Nigeria, Edu also managed to obtain a character certificate from the police indicating that she had no arrests or convictions.

Edu testified that she would demonstrate again if she were returned to Nigeria. She stated that she had nothing to live for, circumstances were now worse in Nigeria than before she left, and that she had lost her cousins and younger brother to the cause. Thus, she would demonstrate because she would "want a better life" for herself and her people. However, she also believed that she would be tortured and killed if she returned. She stated that even if the military did not recognize her, military informants would point her out as a member of the Association. She believes that anybody who is associated with demonstrating, regardless of location, will be tortured or killed. She noted that before her hearing she had learned that her brother-in-law was demonstrating in Lagos and later on his body was found burned and mutilated.

In addition to her own testimony, Edu presented the testimony of Dr. Michael Watts, an expert on Nigeria. Dr. Watts testified that her fear of future intimidation or torture by the military or security forces was reasonable and "consistent

with the current political environment in Nigeria and particu-
larly in the Niger Delta." His assessment was based on her
active and visible membership in politics in the 1980's as well
as her ethnicity. Dr. Watts believed that Edu would be recog-
nized if she returned to Nigeria, and opined that she "would
be tortured if she were to continue her political activity." If
arrested, she would be subject to "sexual violence and rape."
Dr. Watts concluded: "If Ms. Edu upon her return were to be
politically active for all the reasons it motivated her earlier in
her life, there is no question that her life will be endangered."

On August 22, 2002, the Immigration Judge (IJ) granted
Edu's application for deferral of removal under CAT. The IJ
found no reason to doubt Edu's testimony, and, therefore,
accepted it as credible. He found that she had been tortured
in the past, and that she would be tortured if she returned. The
BIA reversed that decision, denied her application for protec-
tion under CAT[3] and ordered her removed. In July 2005,
because of a prior ruling by this court, the BIA remanded the
case to the IJ so that he could issue the removal order in the
first instance. Accordingly, the IJ vacated his prior order and
issued a new one directing her removal to Nigeria. The IJ also
denied her motion to reconsider and reopen the proceedings.
In August and September 2005, Edu appealed the removal
order and the IJ's denial of a motion to reconsider and reopen.
In April 2006, the BIA affirmed the IJ's denial of the motion
to reopen and reconsider. Concomitantly, it construed Edu's
appeal of the removal order as a motion to reconsider its Feb-
ruary 2004 decision vacating the grant of deferral under CAT.
It did reexamine the matter, but ultimately denied the motion
because it determined that it was not unreasonable to "suggest
that [Edu] could avoid torture by refraining from [political]
activities." It declared that CAT was not intended to protect
voluntary behavior and political activism. The BIA also found

---

[3]The BIA held that Edu credibly testified to past torture, but denied her
application because it concluded that "it is entirely appropriate to consider
respondent's ability to avoid torture."

that Edu could reduce her risk of torture by relocating to another part of the country. The dissenting member of the BIA panel would have granted the motion because he found that "nothing in the Torture Convention . . . would require that the alien give up a central part of the alien's life or avocation."

Edu then filed a motion to reopen with the BIA based upon alleged new evidence. The BIA denied that motion. These appeals followed.

## JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1). We note that "[t]he jurisdiction-stripping provision of 8 U.S.C. § 1252(a)(2)(C) does not deprive us of jurisdiction over denials of deferral of removal under the CAT, which are always decisions on the merits." *Lemus-Galvan v. Mukasey*, 518 F.3d 1081, 1083 (9th Cir. 2008); *see also Owino v. Holder*, 575 F.3d 956, 958 (9th Cir. 2009). Moreover, our jurisdiction extends to both issues of law and issues of fact. *See Morales v. Gonzales*, 478 F.3d 972, 980-81 (9th Cir. 2007); *Bromfield v. Mukasey*, 543 F.3d 1071, 1075-76, 1079 (9th Cir. 2008).

We review the BIA's factual findings for substantial evidence. *See Zheng v. Ashcroft*, 332 F.3d 1186, 1193 (9th Cir. 2003); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1, 112 S. Ct. 812, 815 & n.1, 117 L. Ed. 2d 38 (1992). We review issues of law de novo. *See Zheng*, 332 F.3d at 1193. "The BIA's interpretations and applications of immigration law, however, are 'subject to established principles of deference.' " *Id.* at 1194.[4]

---

[4]We recognize that this is technically an appeal from a motion to reconsider and a motion to reopen, both of which are normally subject to abuse of discretion review. *See Ghahremani v. Gonzales*, 498 F.3d 993, 997 (9th Cir. 2007). As to the motion to reconsider at hand, however, we will apply the usual standard of review on direct petitions because, due to the BIA's earlier remand to the IJ, this appeal amounts to a review of the BIA's initial decision on the merits. In any event, the refusal to reconsider here would have been an abuse of discretion for the reasons that we explicate hereafter.

**[1]** That raises the question of just what established principles apply here. That question has not been clearly answered, and, as we will note, we need not definitively answer it now. The Supreme Court has declared that a court should apply "the principles of deference described in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 2782, 81 L. Ed. 2d 694 (1984)," when it confronts " '[the BIA's] construction of the statute which it administers.' " *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424, 119 S. Ct. 1439, 1445, 143 L. Ed. 2d 590 (1999). That seems plain enough, but does not entirely answer the question of when the agency is actually construing the law it administers in a form that the agency intends to be ultimately authoritative. What the regulation guiding the BIA in this regard provides is that "decisions of the Board . . . shall be binding on all officers and employees of the Department of Homeland Security or immigration judges in the administration of the immigration laws of the United States." 8 C.F.R. § 1003.1(g). However, it goes on to say: "By majority vote of the permanent Board members, selected decisions of the Board rendered by a three-member panel or by the Board en banc may be designated to serve as precedents in all proceedings involving the same issue or issues." *Id.* We have declared that "the 'essential factor' in determining whether an agency action warrants *Chevron* deference is its precedential value." *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1012 (9th Cir. 2006). We went on to note that in order to be precedential, a decision must be issued by a three-judge panel, but that, in addition, only selected decisions — those ordered published — are precedential. *Id.* at 1012-13. However, that case involved a decision by a single judge and we stated that "[b]ecause the BIA decision in this case does not fall into either category, it is non-precedential." *Id.* at 1013. Of course, that did not precisely answer the question of what would happen if the decision fell into one of the categories. On its face, the regulation appears to say that three-judge panel rulings are binding on agency actors, but that only published decisions constitute precedent. In this case, the initial BIA decision was made by

one judge, but the decision on the motion to reconsider was made by a panel of three. Neither was designated for publication.

While the former was clearly non-precedential, the nature of the weight of the latter is not quite so obvious. If it is precedential, the *Chevron* rules certainly apply, but if it is not, a degree of deference is still owed. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161, 164, 89 L. Ed. 124 (1944), *see also United States v. Mead Corp.*, 533 U.S. 218, 227-28, 121 S. Ct. 2164, 2171, 150 L. Ed. 2d 292 (2001) (citations omitted). And in making that determination:

> Justice Jackson summed things up in *Skidmore v. Swift & Co.*:
>
> > "The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S., at 140, [65 S. Ct. 161].

*Mead Corp.*, 533 U.S. at 228, 121 S. Ct. at 2172.

**[2]** In this case we will keep both standards in mind, but we are satisfied that the decision in question here could not meet either standard.

## DISCUSSION

As already noted, the major issue before us is whether the BIA erred when it determined that Edu was not entitled to deferral of removal pursuant to CAT. Before plunging further

into that issue, we will clear away the bosk that might other-
wise obscure our discussion.

The IJ determined that Edu was credible, and the BIA
accepted that determination.[5] As a result, the facts to which
she testified are " 'deemed true, and the question remaining to
be answered becomes whether these facts, and their reason-
able inferences, satisfy the elements of the claim for relief.' "
*Nuru v. Gonzales*, 404 F.3d 1207, 1216 (9th Cir. 2005). That
being so, the following facts are established. Edu was tortured
in Nigeria when she participated in political activities (peace-
ful demonstrations), and if she is returned to Nigeria, she will
continue to participate in those activities.[6] It is also proper to
infer that, in that event, she will be tortured again; the IJ so
determined and the BIA did not actually find to the contrary,
although we will say a bit more about that hereafter.

When it first considered this case on February 13, 2004, the
BIA, through a one-judge decision, declared as follows:

> [T]he Convention Against Torture is not designed to
> protect individuals from return to a place where they
> are unable to exercise political rights. It merely pro-
> tects individuals from torture that is more likely than
> not to occur. We agree with the DHS that it is
> entirely appropriate to consider the respondent's
> ability to avoid torture. In view of all the evidence
> described above, we find that the respondent has not
> met her burden of demonstrating that it is more
> likely than not that she would be tortured if returned
> to Nigeria.

---

[5]To the extent that the determinations of credibility were not explicit,
it is important to note that there surely was no explicit adverse credibility
finding; thus she was credible in any event. *See Kalubi v. Ashcroft*, 364
F.3d 1134, 1137-38 (9th Cir. 2004).

[6]Because that is so, it is quite beside the point that at some times in the
past she has been wise or weak enough to refrain from political activities
in Nigeria.

On its second consideration of the issue on April 16, 2006, the BIA elaborated as follows:

> Finally, we note that the Convention Against Torture was not designed to protect individuals from having to return to a place where they are unable to exercise their political rights, but merely to protect them from torture that is more likely than not to occur. Thus, we do not find it unreasonable to suggest that the respondent could avoid torture by refraining from activities that would put her in danger.
>
> In this respect, the respondent has not adequately shown a likelihood of torture arising from her current situation, including her past political activities. . . . Given the unavailability of protection for political expression, we see nothing to legally distinguish the respondent's alleged intention to be politically active from any other form of voluntary behavior that a criminal alien may assert will subject him or her to torture upon removal. We do not interpret the provisions implementing the Convention Against Torture to envision that criminal aliens in the United States can defeat their removal by non-frivolous assertions that they will voluntarily engage in behavior that creates a probability of torture where that probability would not otherwise exist. This holds whether the voluntary behavior is a new criminal act in the country of removal or something, such as political activism, that we would ordinarily protect under other provisions of the immigration laws.[7]

**[3]** Is that determination an analysis of CAT which

---

[7]The BIA, in response to a dissent by one member, asserted that it was not making "a blanket declaration," but its delineation of the rule it was applying makes that disclaimer problematic — it leaves little room for exceptions.

deserves deference due to the validity of its reasoning,[8] or "based on a permissible construction of the [law]"[9]? As we will explain, we answer in the negative because we see no basis for returning Edu to a country where she must either give up her appropriate political behavior or face a substantial risk of torture.

It would be well to first set forth the ringing words of CAT itself, which define torture as the intentional infliction of severe pain or suffering by (as relevant here) public officials when it is: "for such purposes as . . . punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind . . . ." CAT art. 1. And no State Party can return a person to another State where there are "substantial grounds for believing that he would be in danger of being subjected to torture." *Id.* art. 3.

The United States signed CAT[10] and it was ratified by the Senate with certain reservations, understandings, declarations, and a sovereignty provision.[11] As relevant here, the terms of CAT were not affected, except that the "substantial grounds for believing" basis was clarified to mean " 'if it is more likely than not that he would be tortured.' "[12]

Congress then implemented CAT in the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-761, 2682-822-823 (1998) (codified as a note to 8 U.S.C. § 1231 (1991)). Congress expressly stated that "[i]t shall be the policy of the United States not to expel,

---

[8]*Skidmore*, 323 U.S. at 140, 65 S. Ct. at 164.

[9]*Chevron*, 467 U.S. at 843, 104 S. Ct. at 2782.

[10]*See* The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Rep. No. 102-30, at 19 (1991).

[11]*See* 136 Cong. Rec. S17486, S17491-92 (1990).

[12]*Id.* at S17492.

extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." *Id.* at § 2242(a). Congress then clarified that "[e]xcept as otherwise provided, the terms used in this section have the meanings given those terms in the Convention, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." *Id.* at § 2242(f)(2). Congress charged the "appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3" of CAT "subject to any reservations, understandings, declarations, and provisos" in the Senate ratification resolution. *Id.* at § 2242(b).

Accordingly, the Immigration and Naturalization Service and Executive Office for Immigration Review prescribed regulations 8 C.F.R. §§ 1208.16-1208.18,[13] and in so doing recognized that CAT " 'does not permit any discretion or provide for any exceptions.' "[14] The regulations adopt CAT's definition of torture,[15] set forth the alien's burden of persuasion,[16] and declare that credible testimony from the alien may suffice to meet the burden.[17]

**[4]** Nonetheless, the BIA must consider all evidence in deciding whether it is more likely than not that the alien

---

[13]Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8478-79, 8481, 8488-8492 (Feb. 19, 1999) (hereafter Fed. Reg.).

[14]*Id.* at 8481.

[15]8 C.F.R. § 1208.18(a)(1).

[16]That standard is, as Congress directed, that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). That means a greater than fifty percent chance of torture. *See Wakkary v. Holder*, 558 F.3d 1049, 1067-68 (9th Cir. 2009); *Khup v. Ashcroft*, 376 F.3d 898, 907 (9th Cir. 2004).

[17]8 C.F.R. § 1208.16(c)(2).

would face future torture,[18] but the existence of past torture "is ordinarily the principal factor on which we rely."[19] That Edu was tortured in the past is not in question here, and that alone ought to heighten concern for her well-being should she be returned to Nigeria. That being so, what cuts against deferral? Nothing much that was submitted as far as we can scry. The BIA did suggest that because no particular basis for torture need be shown, her condition is not any better than that of a person who plans to return to his own country and commit crimes. But the BIA's reasoning in that regard obnebulates the issue by approaching it in the wrong way. True it is that if criminals are tortured in the country to which an alien is to be returned, CAT does not deny relief to that alien, even if his actions were criminal there. In fact, even if a person was deserving of punishment in that country, torture would not be justified. *See* 8 C.F.R. § 1208.18(a)(1); *Nuru*, 404 F.3d at 1221. And in adopting the regulations, the agencies themselves recognized that even those who assisted in Nazi persecutions, or engaged in genocide, or pose a danger to our own security are not excluded from the protections of CAT. *See* Fed. Reg. at 8478-79. In other words, even if a person does not meet the more stringent standards — like political opinion — under which asylum could be granted,[20] he might be entitled to CAT relief.[21] There is nothing new about that.

[5] What is new is the notion that CAT's precepts mean that an alien can be required to give up the benign, encouraged, and oft protected practice of political beliefs in order to avoid torture, and, therefore, cannot claim that it is more likely than not that he will be tortured. We have rejected that kind of thinking in the asylum area, and have declared that it is "contrary to our basic principles." *Zhang v. Ashcroft*, 388

---

[18]8 C.F.R. § 1208.16(c)(3).

[19]*Nuru*, 404 F.3d at 1218.

[20]*See* 8 U.S.C. § 1101(a)(42)(A).

[21]*See Kamalthas v. INS*, 251 F.3d 1279, 1281-83 (9th Cir. 2001).

F.3d 713, 719 (9th Cir. 2004) (per curiam); *see also Mamouzian v. Ashcroft*, 390 F.3d 1129, 1137 & n.6 (9th Cir. 2004). We think that the BIA's conception of CAT protection is equally contrary to our basic principles, and suggests that we will not protect individuals like Edu who are unwilling, as a matter of conscience, to give up acting on their political beliefs. To put it another way, the BIA reads CAT as if it believes that CAT was designed to prevent the return of only those who will sit quietly by, watching life flow around them — never speaking, never complaining, never acting. But the words of CAT do not express that belief; they reach out to protect even the most vile of actors against state vileness. Nor is there aught to suggest that the practical, vigorous, worldly men who negotiated and drafted CAT meant to express that belief; or that the United States did when it signed on to CAT; or that the senators of the United States did when they ratified CAT; or, for that matter, that the writers of the regulations did. No, that construction of CAT must be seen as an aberration that cannot survive even the most deferential review. Thus, even if CAT, the statute, and the regulations do not expressly eschew that reading by the BIA, we are satisfied that the reading is so antithetical to the intent of the law that it cannot stand.[22]

We do recognize that another factor in the evidence mix is the question of whether Edu could move to a different part of Nigeria, and, thus, avoid torture. *See* 8 C.F.R. § 1208.16(c)(3)(ii). The BIA alluded to that, almost as an afterthought, when it declared that she "could reduce her risk of torture by relocating to another part of the country." Of course, that would not make a great deal of sense because her concern is with her tribe and the other people in the Niger Delta region, where her activity took place and where the

---

[22]We have no occasion to and do not take up the question of what would happen if an alien credibly said that if he were removed to his country he would be tortured for committing some awful crime which he planned to commit when he got there. That situation is not before us.

most severe problems with the government occur.[23] Moreover, the record is replete with evidence that problems for those who protest politically exist throughout the country, and the BIA itself noted that "Nigeria has a poor human rights record." In addition, while not directly on point, we have indicated that when a nation's government is itself persecuting its citizens, "[i]t has never been thought that there are safe places within [that] nation." *Singh v. Moschorak*, 53 F.3d 1031, 1034 (9th Cir. 1995); *see also Fakhry v. Mukasey*, 524 F.3d 1057, 1065 (9th Cir. 2008); *Melkonian v. Ashcroft*, 320 F.3d 1061, 1070 (9th Cir. 2003). Those are cases when the burden was upon the government, and in this area the burden is upon the alien. *See Hasan v. Ashcroft*, 380 F.3d 1114, 1122 (9th Cir. 2004); *cf. Kaiser v. Ashcroft*, 390 F.3d 653, 659, 660 (9th Cir. 2004) (holding that where threats pervaded a country, relocation was not a viable alternative). Still, the record shows that there is danger to political activists throughout Nigeria.

**[6]** More importantly, and in this context conclusive, the BIA itself did not declare that Edu could relocate to a place where she "is not likely to be tortured;"[24] it only said that if she did relocate she "could reduce her risk of torture." That may have had some validity if Edu could be required to give up political activity, for then the risk would only be from her past activities, it seems. As it is, on this record that factor cannot sufficiently bolster the BIA's decision. Therefore, due to the substantial danger of torture Edu would face if she were returned to Nigeria, the BIA erred when it determined that she was not entitled to deferral of removal under CAT.[25]

---

[23]Obviously, demonstrating in some remote region would not be very effective or to the point, even if she would be more safe.

[24]8 C.F.R. § 1208.16(c)(3)(ii).

[25]The government concedes that we should remand Edu's separate claim that the fact that she was subjected to female genital mutilation when she was a child is sufficient to show that she is currently at the risk of torture in Nigeria. Edu agrees. Thus, we will do so.

**[7]** Finally, because the facts and law were already fully developed at the BIA, we see no basis on this record to return this issue to the BIA for further consideration. Simply put, no questions remain — she was tortured and there is a substantial danger that she will be, if returned. We therefore direct that Edu be accorded CAT deferral relief upon remand. *See Nuru*, 404 F.3d at 1223; *see also Zhang*, 388 F.3d at 722.[26]

## CONCLUSION

**[8]** Edu was tortured in Nigeria when she engaged in political activity, and there are substantial grounds for believing that she will be tortured again if she is returned there and continues to engage in that activity. She credibly assured the IJ that she will. We reject the BIA's decision that in order to avoid torture she must simply give up an activity that most countries (including Nigeria per its constitution[27]) guarantee to their citizens. The apotropaic effect of CAT is not so limited. Thus, we grant her petition and order relief because she cannot be forced to choose between her conscience and torture. However, we remand as to Edu's female genital mutilation claim so that the BIA can consider that separate, additional basis for CAT relief.

Petition in No. 06-72609 GRANTED, and REMANDED. Petition in No. 07-70590 DISMISSED as moot.

---

[26]In light of this determination, we dismiss as moot the petition for review of the BIA's refusal to grant Edu's motion to reopen. *See Doissaint v. Mukasey*, 538 F.3d 1167, 1171 (9th Cir. 2008).

[27]*See* U.S. Dept. of State, Country Reports on Human Rights Practices (Nigeria, 2001), §§ 2b, 3 (2002) (discussing Nigerian Constitutional provisions protecting political freedom and freedom of assembly).