**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANIEL O. OYENIRAN, AKA Daniel
Olu Abraham, AKA Daniel Segun
Oyeniran,

*Petitioner,*

v.

ERIC H. HOLDER Jr., Attorney
General,

*Respondent.*

Nos. 09-73683
10-70689

Agency No.
A091-426-019

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

On Petitions for Review of Decisions of the
Board of Immigration Appeals

Argued and Submitted
February 6, 2012—San Diego, California

Filed March 6, 2012
Amended May 3, 2012

Before: M. Margaret McKeown and Milan D. Smith, Jr.,
Circuit Judges, and Rudi M. Brewster, District Judge.*

Opinion by Judge Brewster

*The Honorable Rudi M. Brewster, Senior United States District Judge
for the Southern District of California, sitting by designation.

## COUNSEL

Philip D. Bartz (argued) and Nicholas S. Sloey, Bryan Cave LLP, Washington, D.C., for the petitioner-appellant.

Enitan O. Otunla (argued) and Francis W. Fraser, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent-appellee.

## ORDER

Respondent's Motion to Amend the Opinion filed March 6, 2012, slip op. 2577, 672 F.3d 800, is hereby GRANTED.

The Opinion shall be amended as follows, at slip op. at 2589, 672 F.3d at 807, after the heading <**B. New Evidence that Arose *after* the First Decision Impacts Deferral** >, the first complete sentence and the citation are deleted and replaced with the following text, including footnote 5:

> The BIA erred when it reasoned that collateral estoppel did not apply *because* deferral is "properly considered . . . on a de novo basis."[5]

> [5] The BIA did not cite any authority for this proposition; however, there is similar language in the regulation governing termination of CAT deferral of removal. 8 C.F.R. § 1208.17(d)(3). Oyeniran's case was in a different, though analogous, procedural posture. *See supra* note 4.

Future petitions for rehearing will not be accepted from the filing of the amended opinion.

## OPINION

BREWSTER, Senior District Judge:

Petitioner Daniel O. Oyeniran ("Oyeniran"), a citizen of Nigeria, seeks review of decisions by the Board of Immigration Appeals ("BIA") to deny him protection under the Convention Against Torture ("CAT") and to deny his motion to reopen the case to consider new evidence.[1] We hold that collateral estoppel binds the BIA to its prior determination of the facts and legal consequences regarding *past* incidents of government-sponsored violence against Oyeniran's family due to his father's activities supporting Christianity over Islam. We also conclude that the BIA abused its discretion by denying Oyeniran's motion to reopen to consider the significant new evidence of a Nigerian arrest warrant that charges Oyeniran personally with inciting opposition to Sharia law. On remand, the BIA should consider all the new evidence, including Oyeniran's voluntary trip to visit his sick mother; however, the BIA's prior findings of fact constitute a baseline on which the BIA evaluates Oyeniran's current CAT application to determine whether it is more likely or not that he will be tortured if removed to Nigeria. We grant Oyeniran's petitions and remand for further proceedings consistent with this opinion.

## I. Background

Oyeniran is a native and citizen of Nigeria. According to the United States Department of State's Country Reports on

---

[1] We appointed pro bono counsel to represent Oyeniran in these consolidated proceedings. We thank Philip Bartz for his able assistance and substantial effort in that regard.

Human Rights Practices, Nigeria has equal populations of Christians and Muslims. Deaths and violence attributed to religious differences are common. Nigeria has a central federal government as well as thirty-six separate States. Since approximately 2000, twelve States have adopted Islam as the de facto State religion and now enforce Sharia law. The Sharia Penal Code is based upon the Koran and includes punishments such as stoning, amputation, and death.

In 1990, Oyeniran was admitted to the United States as a lawful permanent resident. In 2005, based upon several criminal convictions, he was found to be removable. Due to his criminal record, Oyeniran's only avenue for relief from removal is deferral under the CAT. 8 C.F.R. § 1208.17.

"An applicant qualifies for protection under [the] Convention Against Torture if he can show that if removed to his native country, it is more likely than not that he would be tortured by public officials, or by private individuals with the government's consent or acquiescence." *Afridi v. Gonzales*, 442 F.3d 1212, 1221 (9th Cir. 2006), *overruled on other grounds by Estrada-Espinoza v. Mukasey*, 546 F.3d 1147 (9th Cir. 2008) (en banc); 8 C.F.R. § 1208.18. "More likely than not" "means a greater than fifty percent chance of torture." *Edu v. Holder*, 624 F.3d 1137, 1445 n.16 (9th Cir. 2010). Acquiescence exists when "public officials were aware of the torture but 'remained willfully blind to it, or simply stood by because of their inability or unwillingness to oppose it.' " *Bromfield v. Mukasey*, 543 F.3d 1071, 1079 (9th Cir. 2008) (citation omitted); *Afridi*, 442 F.3d at 1221; *Zheng v. Ashcroft*, 332 F.3d 1186, 1194-95 (9th Cir. 2003).

An alien who has been granted deferral of removal under the CAT may stay temporarily in the United States. 8 C.F.R. § 1208.17(b)(1)(i). The Government can terminate deferral status based on new evidence or when conditions change. *Id.* § 1208.17(b)(1)(iii), (b)(1)(iv), (d)(1).

## A. *Oyeniran Obtained Deferral under the CAT in 2005*

In 2005, the Immigration Judge ("IJ") applied the CAT standard to the evidence presented and held that Oyeniran was entitled to deferral. The Government appealed the ruling, but the BIA affirmed the decision to grant Oyeniran's CAT application.

The evidence relevant to the collateral estoppel issue included testimony by Oyeniran and an expert witness, and documents including Country Reports, police reports, and newspaper articles. In brief, the evidence showed that Oyeniran's father, Abraham Oyeniran, is a Pentecostal Christian Archbishop and President of the United Global Churches Association of Nigeria (hereinafter "Archbishop").[2] The Archbishop is an outspoken and prominent critic of the Nigerian government and of extremist Islamic groups who seek to implement Sharia law. The Archbishop engaged in high-profile activities to convert Muslims to Christianity. He also supported the American war in Iraq.

Oyeniran described in detail two attacks on the Archbishop. Both occurred while Oyeniran was living in the United States. Oyeniran relayed the information his father told him, and substantiated the violent events by introducing police reports and newspaper articles. In the first attack in 2003, Islamic fundamentalists stopped the Archbishop's car on the way to a "crusade" and beat up the Archbishop's other son (Gbenga). In 2004, Islamic extremists invaded the Archbishop's home, beat up several members of the family, and made threats against all of the Archbishop's children. Oyeniran testified that the police knew the violence was based on religious differences, but they try to stay neutral and will not interfere or complete any investigation.

---

[2]The Archbishop did not testify or provide any information in the 2005 proceeding except that, during the administrative appeal, the Archbishop signed an affidavit stating that Oyeniran was his son.

The expert testimony corroborated Oyeniran's position on three points. First, Nigerian culture holds each member of the family responsible for the controversial conduct of any single member; thus, the attacks on the Archbishop threatened the safety of his children, including Oyeniran. Second, the police acquiesce to violence between religious groups. Moreover, the authorities often provoke violence by hiring "thugs" to beat or rob religious activists. Third, Sharia law is pervasive in Nigeria and imposes harsh punishments that constitute torture.

Based on this record, in 2005, the IJ found and the BIA affirmed that Oyeniran was credible and that he presented sufficient evidence to show a likelihood that he would be tortured upon his return to Nigeria.

At every stage of the administrative proceedings, the Government challenged Oyeniran's claim. The Government argued Oyeniran had not established that he would be tortured with the acquiescence of the Nigerian government because his evidence was speculative and from unreliable sources. It argued that there was no evidence Oyeniran was in any danger simply because the Archbishop had been attacked by common criminals. The Government argued the motive for the attacks was unknown. It contended that the reasons the police failed to make any arrests were pure conjecture. The IJ and BIA rejected these arguments about the weight of the evidence and held that Oyeniran had met his burden of proof under the CAT.

**B.  *Oyeniran Returns to Nigeria to Visit his Mother in the Hospital***

In May 2007, the Archbishop asked Oyeniran to come to Nigeria to visit his mother who had suffered a severe stroke and might not survive. In June 2007, Oyeniran traveled to Nigeria and stayed with his mother in the hospital for a month.[3]

---

[3]The Government improperly issued Oyeniran an emergency visa to return to Nigeria. The visa should not have been available to an alien who

Several arrangements were made to ensure that no one knew Oyeniran was in Nigeria. Oyeniran stayed at the hospital his entire visit. Oyeniran's mother was protected at the hospital by the security that the church had hired for the Archbishop.

## C.  *Oyeniran is Denied Deferral under the CAT in 2009*

Upon his return to the United States, the Government initiated a second administrative proceeding to remove Oyeniran.[4] This time, Oyeniran was denied deferral under the CAT.

Oyeniran and the expert witness both ratified their prior testimony. In contrast to the prior proceeding, the Archbishop testified in person and added his reasons for believing the violent incidents were committed by Sharia fundamentalists who wanted to harm his children. The Archbishop also testified that the church had hired security guards to protect him and his wife. He mentioned recent attempts to harm him. In addition, Oyeniran and the Archbishop described the security precautions taken for the month-long visit to the mother in the hospital in 2007. New corroborating documents were introduced.

The IJ found that Oyeniran was not credible and held that Oyeniran had not met his burden of proof, describing the evidence as speculative. Oyeniran appealed. The BIA affirmed the denial of deferral, even though, ironically, it expressly found Oyeniran's testimony credible, reversing the IJ on that point. It held the 2005 grant of deferral had "no dispositive

was in the United States on a CAT deferral.

When Oyeniran returned to Los Angeles, the Government's computer showed incorrect information about his status.

[4]For simplicity, we refer jointly to a "second" hearing because the evidence submitted during the 2008 proceeding (on a motion to terminate deferral) was incorporated into the 2009 hearing (on a motion to remove an arriving alien and Oyeniran's second application for CAT protection).

effect" and that the CAT claim was properly considered "on a *de novo* basis." The BIA rejected Oyeniran's res judicata argument holding that the grant of deferral is expressly subject to reconsideration. The BIA held that the violence in 2003 and 2004 did not amount to torture and that those attacks had not been sufficiently linked to the Nigerian government.

### D. *Motion to Reopen to Consider Nigerian Arrest Warrant*

In December 2009, Oyeniran moved to re-open the proceedings to submit new evidence that the Supreme Magistrate's Court of Nigeria in Lagos issued a warrant of arrest against him. Dated May 28, 2008, it charged that Oyeniran had engaged "yourself and others at large in inciting and riotously challenging the spreading and propagation of Sharia laws and traditions."

Oyeniran stated that he did not have the evidence at the time of the original hearings and could not have discovered the warrant any earlier. He submitted a sworn affidavit stating that he had called Nigeria on October 2, 2009 to talk to his father at the church office. His father's secretary answered the phone and told Oyeniran about the warrant.

In February 2010, the BIA decided that the date of the warrant (May 2008) showed the evidence was available and could have been presented at the hearings. The BIA held that, in any event, the evidence would not change the result.

### II. *Jurisdiction*

We have jurisdiction to review a denial of deferral of removal under the CAT. *Edu*, 624 F.3d at 1141-42; *Haile v. Holder*, 658 F.3d 1122, 1125 (9th Cir. 2011). We also have jurisdiction over the denial of a motion to reopen. *Medina-Morales v. Ashcroft*, 371 F.3d 520, 527-28 (9th Cir. 2004).

### III. *Standards of Review*

" 'Where, as here, the BIA conducts a *de novo* review and issues its own decision, rather than adopting the IJ's decision as its own, we review the BIA's decision.' " *Hernandez-Guadarrama v. Ashcroft*, 394 F.3d 674, 679 (9th Cir. 2005) (citation omitted).

"Whether collateral estoppel is available is a mixed question of law and fact in which the legal issues predominate. The question of its availability is subject to our *de novo* review." *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1519 (9th Cir. 1985), *superceded on other grounds by* 28 U.S.C. § 1961, Pub. L. No. 97-258, § 2(m)(1), 96 Stat. 877, 1062 (1982), *as recognized in Northrop Corp. v. Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1156 (9th Cir. 1988).

The abuse of discretion standard governs the denial of a motion to reopen proceedings. *Edu*, 624 F.3d at 1142 n.4 (citing *Ghahremani v. Gonzales*, 498 F.3d 993, 997 (9th Cir. 2007)).

### IV. *Discussion*

#### A. *Collateral Estoppel Applies in Immigration Proceedings*

[1] It is beyond dispute that the doctrine of collateral estoppel (or issue preclusion) applies to an administrative agency's determination of certain issues of law or fact involving the same alien in removal proceedings. *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Ramon-Sepulveda v. INS*, 824 F.2d 749, 750 (9th Cir. 1987) (per curiam) (doctrine applies even when the agency reopens a removal proceeding for new evidence); *Matter of Fedorenko*, 19 I. & N. Dec. 57, 57 (BIA 1984) (doctrine conclusively establishes the ultimate facts of a subsequent deportation proceeding and precludes reconsid-

eration of issues of law resolved by the prior judgment —
absent a change in the controlling law).

Collateral estoppel applies to a question, issue, or fact when
four conditions are met: (1) the issue at stake was identical in
both proceedings; (2) the issue was actually litigated and
decided in the prior proceedings; (3) there was a full and fair
opportunity to litigate the issue; and (4) the issue was neces-
sary to decide the merits. *Montana v. United States*, 440 U.S.
147, 153-54 (1979); *Clark v. Bear Stearns & Co., Inc.*, 966
F.2d 1318, 1320 (9th Cir. 1992).

**[2]** We conclude that the BIA erred by rehashing the his-
torical facts and its findings of law as applied to the 2003 and
2004 incidents of violence that formed the basis of its 2005
decision to grant deferral. We hold that the Government is
conclusively barred from re-litigating the following findings:
the attacks in 2003 and 2004 constituted torture as that term
is defined by the CAT based upon the injuries suffered by the
Archbishop and other family members; the acts of violence
were intended to punish or intimidate the religious and politi-
cal beliefs of the Archbishop due to his prominent role in crit-
icizing the Nigerian government, opposing Sharia law, and
converting Muslims to Christianity; the attackers were Islamic
extremists; the past attacks threatened Oyeniran's safety by
virtue of his father's activities, the family relationship, and the
culture of Nigeria; and the government of Nigeria was either
involved or acquiesced in the prior attacks.

**[3]** These issues were "actually litigated" in 2005 and the
findings were "necessarily determined in the prior proceed-
ing" to grant Oyeniran CAT relief in 2005. *United States v.
Lasky*, 600 F.2d 765, 769 (9th Cir. 1979).

**[4]** The Government had a fair opportunity to litigate the
circumstances of the 2003 and 2004 attacks at the first hear-
ing. The Government specifically attacked the evidence in
that very proceeding, for example, by cross examining the

witnesses and challenging the weight of the evidence. All of the weaknesses mentioned by the BIA in 2009 were evident when Oyeniran first offered the evidence in 2005.

The Government argues that the 2009 decision is justified by the Archbishop's testimony, as he did not appear in the 2005 proceedings. We disagree. The introduction of new evidence on a matter previously resolved is not an exception to collateral estoppel. *Ramon-Sepulveda*, 824 F.2d at 750-51; *see Bravo-Pedroza v. Gonzales*, 475 F.3d 1358, 1359 (9th Cir. 2007) ("Res judicata bars the government from bringing a second case based on evidence . . . that it could have presented in the first case."); 18 Moore's Fed. Practice § 132.02[2][c], [d] (3d ed. 2010) (distinguishing evidence of "changed circumstances" from evidence that is "historical in nature").

**[5]** Moreover, the BIA's flip-flop on *past* issues is unsupported and arbitrary because the additional evidence introduced during the 2009 hearing was stronger than the evidence presented in 2005. In 2005, Oyeniran's testimony about the violence was hearsay, but in 2009 the Archbishop testified as a percipient witness to the attacks. The Archbishop corroborated that the attacks had been committed by Islamic extremists who would harm his children. He testified that the attackers in 2003 wore distinctive Sharia police uniforms. He introduced another police report confirming that the attackers in 2004 had come "to eliminate his children." Additionally, the violence prompted the Archbishop's church to hire security protection "against Islamic Terrorists." In all, the Archbishop's testimony reinforced and was fundamentally consistent with the evidence supporting his son's earlier application for CAT protection.

We are not persuaded by the Government's argument that the 2009 hearing involved a different claim that was not identical to the 2005 claim. Instead, we find a clear identity on the issue of the nature of the 2003 and 2004 attacks. The ramifi-

cations of those past events were plainly resolved in Oyeniran's favor in the prior CAT proceeding. Nor do the new facts explain the BIA's complete reversal of its view of past events.

In sum, this case is a textbook example that "repose is justified on the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991).

**B.**  ***New Evidence that Arose* after *the First Decision Impacts Deferral***

**[6]** The BIA erred when it reasoned that collateral estoppel did not apply *because* deferral is "properly considered . . . on a de novo basis."**[5]** The BIA failed to recognize that collateral estoppel applies to findings made in the initial determination *and* that new evidence and changed circumstances now permit it to reconsider the substantive question of whether the alien with deferral status is more likely than not to be tortured in the future if returned home.

It is obvious that the initial decision to grant deferral under the CAT does not forever bind the agency to the *ultimate conclusion*. The very nature of deferral permits reevaluation of whether it is more likely than not that an alien will be tortured in the future based on *new* facts. *Al Mutarreb v. Holder*, 561 F.3d 1023, 1031 (9th Cir. 2009) (in a new proceeding, the Government can present "facts that have arisen or come to light after" the original proceeding took place); *Belayneh v. INS*, 213 F.3d 488, 491-92 (9th Cir. 2000) (conditions in a country can change over time).

---

**[5]**The BIA did not cite any authority for this proposition; however, there is similar language in the regulation governing termination of CAT deferral of removal. 8 C.F.R. § 1208.17(d)(3). Oyeniran's case was in a different, though analogous, procedural posture. *See supra* note 4.

On remand, the BIA may consider events that occurred *after* the 2005 hearing. The BIA must evaluate any new evidence in light of the prior findings on past events to decide Oyeniran's current application for deferral from removal. The new evidence includes, but is not limited to, evidence such as the circumstances surrounding Oyeniran's clandestine trip to Nigeria in 2007 and, as discussed below, the 2008 Sharia arrest warrant. *See Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1091-92 (9th Cir. 2005) (an applicant's return trip to his country is relevant to his fear of future persecution, but standing alone it is not fatal to an asylum claim). At the same time, the BIA's prior decision conclusively resolved certain past events and those historical events cannot be re-litigated. The BIA must respect the principle of repose.

**[7]** Nonetheless, we decline Oyeniran's invitation to reach the merits of whether substantial evidence supports the decision to deny his application for deferral. The BIA should have an opportunity to conduct a proper analysis of the entire record of relevant evidence.

## C. *Motion to Re-Open*

**[8]** "[A] motion to reopen alleges new facts that bear upon the agency's earlier decision." *Ghahremani*, 498 F.3d at 997 n.1. The BIA's regulations state that "[a] motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1).

**[9]** We conclude the BIA abused its discretion by rejecting the new evidence. *Arrozal v. INS*, 159 F.3d 429, 432-33 (9th Cir. 1998). Oyeniran offered a legitimate and plausible explanation that he first learned about the warrant when he called his father in late 2009 and the secretary told him about it. *See Malty v. Ashcroft*, 381 F.3d 942, 947 (9th Cir. 2004); *Ordonez v. INS*, 345 F.3d 777, 786-87 (9th Cir. 2003). It is not suffi-

cient that the evidence physically existed in the world at large; rather, the evidence must have been reasonably available to the petitioner. *See Afriyie v. Holder*, 613 F.3d 924, 937 (9th Cir. 2010); *Iturribarria v. INS*, 321 F.3d 889, 895 (9th Cir. 2003) (reversing denial of motion to reopen when "evidence was not as a practical matter discoverable"). Oyeniran was in custody from 2007 to 2010 in an immigration detention facility in Texas. Oyeniran's confinement supports his assertion that he could not have discovered that a judge in Nigeria issued an arrest warrant until he called his father's office in October 2009 and happened to speak to the secretary who knew about it. The slight delay between Oyeniran's discovery of the warrant in October and its submission to the BIA in December is reasonably explained by the time needed to get a copy of the warrant from Nigeria to Texas. *Sidhu v. INS*, 220 F.3d 1085, 1091-92 (9th Cir. 2000) (recognizing difficulty of obtaining evidence from foreign countries).

**[10]** Moreover, the new evidence is significant, dramatic, and compelling. The warrant shows that the Nigerian government is actively pursuing Oyeniran for "inciting and riotously challenging the spreading and propagation of Sharia laws and traditions." This political and religious charge is the basis of Oyeniran's request for CAT relief. The charge is directed against Oyeniran *personally*. *Najmabadi v. Holder*, 597 F.3d 983, 987 (9th Cir. 2010) (evidence showing persecution was directed "specifically" at petitioner is "qualitatively different" than generalized information on country conditions).

The warrant is also troubling because it was issued at a time when Oyeniran was in custody in the United States. Though the warrant charges conduct "in" Lagos State and claims that the "defendant was duly served with the summons," aside from his trip to his mother's hospital bed in 2007, Oyeniran had not been in Nigeria since 1997 and denies having been served. The new evidence thus supports the expert's testimony that opponents will impute the religious activities of the Archbishop to his children and that visible

and vocal opposition to Sharia law is prosecuted and punished by entities of the Nigerian government.

[11] On remand, the BIA should consider the new evidence of the arrest warrant along with all of the other new evidence presented to decide Oyeniran's application for deferral.

## Conclusion

We conclude that collateral estoppel binds the BIA to its prior determination that the attackers in 2003 and 2004 were Islamic extremists seeking to punish the Archbishop for his outspoken criticism of Islam and his efforts to convert Muslims to Christianity; that the violence satisfied the definition of torture under the CAT; that the prior attacks constitute a threat to Oyeniran by virtue of his family relationship to the Archbishop; and that the Nigerian government turned a blind eye to the prior violent incidents against the Archbishop's family. We also conclude that the BIA erred by denying the motion to reopen to introduce the Nigerian warrant that charges Oyeniran with violating Sharia law. On remand, the BIA shall reconsider the merits of Oyeniran's application for deferral in a manner consistent with this opinion.

**PETITIONS FOR REVIEW GRANTED; REVERSED AND REMANDED.**