**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HUBERT GEORGE COLE,
                    *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,
                    *Respondent.*

No. 09-73625

Agency No.
A092-817-988

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
December 7, 2010—Pasadena, California

Filed September 22, 2011

Before: John T. Noonan, Marsha S. Berzon, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Berzon;
Concurrence by Judge Noonan;
Dissent by Judge Callahan

17957

## COUNSEL

Fatma E. Marouf, Marouf Law Group, Los Angeles, California, for the petitioner.

Tony West, Assistant Attorney General, Civil Division, Thomas B. Fatouros, Senior Litigation Counsel, and Pegah Vakili and Yedidya Cohen, Trial Attorneys, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for the respondent.

## OPINION

BERZON, Circuit Judge:

We consider the application of Hubert George Cole (Cole), a citizen and national of Honduras, for deferral of removal under the Convention Against Torture (CAT). The Board of Immigration Appeals (BIA) denied the application, concluding that Cole had not established he would more likely than not be tortured if removed to Honduras. Because the BIA failed to give reasoned consideration to potentially dispositive testimony by Cole's expert witnesses and did not address all of Cole's claims, we grant the petition and remand to the BIA.

## I.

Cole, a 40-year-old, black, former gang member, was born in Honduras and entered the United States at age eleven with his mother and two sisters. Cole has a lengthy criminal history in the United States, beginning when he was a juvenile. While in prison, he joined the Crips, an African American gang, as a way to protect himself from Hispanic gangs. While a member of the Crips, he was tattooed with gang-related symbols and letters on his face and body. In August 2007, Cole was the victim of a drive-by shooting; he was seriously injured and needs ongoing medical care.

The Department of Homeland Security commenced removal proceedings against Cole on July 11, 2008. The Notice to Appear charged that Cole was removable because he entered without being admitted or paroled and was convicted, on June 18, 1999, for possession of cocaine for sale. Cole conceded removability and applied for asylum, withholding of removal, and relief under CAT. After the immigration judge (IJ) denied all his claims for relief, Cole appealed only the CAT claim to the BIA, which dismissed the appeal. Whether the BIA properly denied CAT relief is the only issue before us.

## A.   Factual Background

Cole testified that while incarcerated as a young man, he felt threatened by Hispanic gang members, joined the Crips for protection, and acquired several Crips tattoos, including a teardrop under his eye, a G behind his ear, and tattoos on his calves, arms and back. Once released from prison Cole stopped associating with the Crips and worked at a homeless services agency. Nevertheless, rival gangs could still identify him as a Crips gang member because of his tattoos. According to Cole, Hispanic gangs hate the Crips and kill Crips gang members. Cole has not had the tattoos removed because tattoo removal is a painful and long process.

Despite disassociating himself from the Crips, Cole continued to feel threatened by Hispanic gang members. In August 2007, Cole was the victim of a drive-by shooting by Hispanic gang members.[1] He was outside a store with a friend when a car with four or five Hispanic people drove by; the car's occupants were pointing at him and yelling out their gang affiliation — Santa Monica 13. Cole and his friend quickly got back into their car. But, before his friend could get his car started, the other car pulled up on the passenger side, where Cole was sitting, and a Hispanic man started shooting at Cole.

Cole was shot in the head and abdomen. Half his liver and part of his skull had to be removed because of the shooting. Hospitalized for five or six months, Cole was still experiencing problems related to his brain injury at the time of his testimony. In his declaration, Cole stated that he now has a

---

[1]Cole also testified about one other specific instance in which he encountered Hispanic gang members after he was released from prison: Once, while he and his friends were watching fireworks at the Santa Monica pier, 18th Street gang members approached and asked them if they were Crips. Cole testified that there was a lot of tension until the police appeared and took some of the 18th Street gang members to jail. He testified that he believes "something terrible," such as someone being stabbed, would have happened if the police had not arrived.

defective, fragile skull and that he can easily injure his brain if he is not careful. A letter from his doctor confirmed that he has a "sizable skull defect with no protection of his brain" and asserted that, for this reason, incarceration could put him at a high risk of serious injury. Cole's doctor told him he will be in pain for a long time and will likely have seizures in the future, necessitating ongoing medical care.

Cole maintains that if returned to Honduras, he will be tortured and possibly killed by gangs, police, or death squads, because of his race and his gang-related tattoos.[2] He testified that his race,[3] his tattoos, his general appearance, and even his accent will mark him as an outsider in Honduras, and that he believes that, even if the police do not harm him themselves, they will think he is a gang member and so not protect him. Cole also fears that the police will detain him and that he will be intentionally exposed to torturous prison conditions because of his tattoos. Finally, Cole contends that he will be intentionally denied necessary medical care by public health officials in Honduras because of his tattoos, and that the intentional denial of medical care also qualifies as torture.

---

[2]The dissent emphasizes that there is no evidence in the record to suggest that the Crips operate in Honduras. It argues that there is, therefore, no reason to think that Cole will suffer harm because of his Crips tattoos. But Cole's claim does not rely on the presence of Crips in Honduras. Rather, he claims — and presented evidence — that (1) Hispanic gang members removed from the United States and returned to Honduras are likely to bring their rivalries with them and to recognize Cole's tattoos as those of a rival gang; (2) Honduran gangs are likely to see Cole as a threat because of his tattoos regardless of whether they can identify the gang with which he was affiliated; and (3) the Honduran government, police, and medical personnel associate tattoos with gang membership, regardless of the nature of the tattoo, and are not likely to inquire further as to the meaning of the tattoo or whether a tattooed person maintains gang membership.

[3]The record includes documentation of racial inequality and discrimination in Honduras against Afro-Hondurans.

Cole's sister and mother testified that they are also afraid Cole will be tortured or killed if returned to Honduras and will not be able to receive the medical care that he needs.

## 1. Expert Testimony

Cole supported his CAT claim with testimony from two experts. Luis Javier Rodriguez (Rodriguez) testified as an expert on the "structure and dynamics of U.S. and Central American gangs, including the racial rivalries among those gangs." He discussed the origins of two large Hispanic gangs, Mara Salvatrucha (MS-13) and 18th Street, and how those gangs spread to Central America, primarily through gang members deported from the U.S. Rodriguez explained that the Crips gang is viewed as an enemy by Hispanic gangs, including MS-13 and 18th Street, whose members attack members of African American gangs. According to Rodriguez, the Hispanic gangs can easily spot Crips tattoos. He also testified that the Hispanic gang members brought their "anti-black culture" down to Central America when they were deported and that someone with Crips tattoos would likely be threatened, beaten, or killed in Central America by either MS-13 or 18th Street gang members.

Cole's second expert, Elmer Javier Canales Mesa (Canales), had about nine years experience working with gang members and former gang members in Honduras. Canales testified that the two biggest gangs in Honduras are MS-13 and 18th Street and that members of these gangs kill people with tattoos from rival gangs such as the Crips. In Canales' experience, the Honduran police do not investigate the murders of gang members or suspected gang members.

Canales also testified that it is illegal to be a member of a gang in Honduras and that having a gang-related tattoo can lead to a prison sentence of six to twelve years. According to Canales, suspected gang members in the area where he works are each detained by police two or three times per week and

sometimes jailed. Honduran police also physically abuse suspected gang members by throwing them on the ground and beating them with their weapons.[4] In one case he knew of, a police officer tortured two gang members to death. That officer, a former police chief, is in jail as a result of an investigation by the organization for which Canales works. Generally, however, police are not held accountable for harming gang members.

Canales also testified about specific incidents in which police or prison guards killed suspected gang members in prison. In an incident that occurred three or four years before the hearing, 68 suspected gang members died after being shot by prison guards. The year he testified, more than 20 suspected gang members had been killed in jail on the first day they arrived there; Canales attributed the slaughter to "police negligence." He also testified about an incident in which 104 gang members died in a fire in their cell block. The guards blocked their escape by not opening the gate, and it was later determined that the fire was set by the police.

In Canales' opinion, based on statistics, studies, and his experiences over the years, Cole has a 90% chance of being detained by the Honduran police and a greater than 75% chance of being killed by gang members in Honduras because of his Crips tattoos. Canales also testified about the risk Cole would face in Honduras from death squads and social cleansing aimed at eliminating gang members. According to Canales, groups of police and other powerful citizens torture and kill those they find undesirable, including suspected gang members. Canales reported that such groups act with complete impunity in Honduras.

Finally, Canales spoke about the inability of suspected gang members to get medical care in public hospitals in Hon-

---

[4]Canales also testified that he had been punched in the back and chest by police for defending the youth with whom he worked.

duras. He had personally accompanied gang members and former gang members to hospitals and had seen doctors refuse to care for them. One young man, wounded and bleeding, died in the waiting room because doctors refused to treat him. Most doctors in Honduras, Canales stated, would refuse to treat an individual with tattoos because they would suspect him of being a gang member. Also, he reported, the government does nothing to hold healthcare workers accountable in such situations, despite demands from his organization. According to Canales, Cole would be denied emergency medical care if he needed it and, in a non-emergency situation, would get treatment only if accompanied by the Commissioner for Human Rights.

Given the high risk of harm former gang members in Honduras face from rival gangs, police, and vigilante groups, most of the former gang members with whom he works attempt to remove their tattoos to make themselves less identifiable. There are some programs in Honduras to help former gang members remove tattoos, but, Canales reported, they cannot meet the demand,[5] and the process is long, extremely painful, and often results in visible scarring. In his written declaration, Canales explained that because such "scars are often visible . . . these individuals remain a target for gang members, death squads, and the police."

## 2. Documentary Evidence

Both Cole and the government submitted extensive documentary evidence, including reports by the U.S. government and by United Nations agencies. Many of the reports corroborated aspects of Cole's experts' testimony.

---

[5]Out of desperation, some former gang members attempt to remove their tattoos using methods such as cigarette burns, mosquito repellent, car battery acid, acid creams, and metal cleaners. Former gang members go to such extreme lengths to remove their tattoos because young people with tattoos run a great risk of being killed.

For example, the 2008 U.S. State Department report recognized several human rights problems in Honduras, such as "unlawful killings by members of the police and government agents; arbitrary and summary killings committed by vigilantes and former members of the security forces; violence against detainees by security forces; harsh prison conditions; [and] corruption and impunity within the security forces." The report confirmed that gang membership, without more, was illegal in Honduras and punishable by up to 12 years in prison, and that police arrested people based on factors such as their tattoos. The report also noted that private security companies and vigilante groups acted, with the complicity of police, as death squads to kill "supposed habitual criminals."

Moreover, although the Honduran constitution prohibits torture, there were instances in which government officials employed such practices, including beatings and other abuse of detainees. The 2008 State Department report stated that the Committee for the Defense of Human Rights in Honduras had reported that police arbitrarily detained and sometimes tortured more than two dozen individuals during a government program called Operation National. The 2007 State Department report placed the number of individuals arbitrarily arrested and, sometimes, tortured under Operation National at more than 34,000 and noted that a number of prisoner deaths had been attributed to members of the security forces.

On the other hand, the 2008 State Department report acknowledged that the government had undertaken some investigations of illegal activities by security forces. For example, on June 6, 2008, a court found guilty and sentenced 21 of the 43 government officials implicated in a 2003 jail massacre.

Other documentary evidence confirmed and expanded on the information in the State Department reports. A 2007 Congressional Research Service report noted that increased violence by gangs has led to corresponding vigilantism, with

increasing extrajudicial killings. It also acknowledged the July 2003 legislation in Honduras making membership in a gang punishable by up to 12 years in prison and confirmed that a prison fire in 2004 killed 107 inmates, mostly gang members. Similarly, a 2006 U.S. Agency for International Development (USAID) report on gangs in Honduras noted that the Honduran government's strict approach includes rounding up tattooed individuals and putting them in prison for gang membership. The report also noted that when gang members were killed or died in prisons, often no one was punished.

An August 2008 report by the UN High Commissioner for Refugees (UNHCR) counted "lack of accountability and professionalism within the police," "the frequent abuse of detainees," and "a culture of impunity for violations of human rights including extrajudicial executions" as among Honduras' biggest human rights problems. The report also discussed a 2006 anti-gang initiative that called for recruiting 30,000 to 60,000 private security personnel to join the efforts of the 10,000 armed services personnel and 8,000 police officers, and granting the private security personnel "the right to use any means necessary to deter assailants from committing criminal acts." The report noted that the policy had led to mass arrests, and that there were reports of excessive and even lethal force being used by these private security forces. The UNHCR report also discussed evidence that death squads were executing gang members, noting "the widespread conviction that [the unlawful killings] are being committed by members of the existing or former security forces."

Finally, numerous newspaper articles also discussed the problems of government-linked death squads, extrajudicial killings, and the high level of violence in Honduran prisons. Particularly disturbing were reports regarding fires in prison, some reportedly deliberately set by security forces, which have killed around 200 prisoners, mostly gang members. One article noted that an independent report commissioned by the President of Honduras found that in one prison fire, 51 of the

68 people who were killed had been "executed — shot, stabbed, beaten or burned to death by a force of the state police, soldiers, prison guards and prisoners working with the guards."

## B.   IJ and BIA Decisions

The IJ denied Cole's application for deferral of removal under CAT, finding that Cole's evidence "str[ung] together a series of suppositions," but did not show that each step in the hypothetical chain of events was more likely than not to occur.[6] In particular, the IJ (1) faulted the expert testimony about the likelihood that Cole would be tortured as lacking evidence that individuals similarly situated to Cole had been incarcerated and tortured; (2) noted that, according to the State Department report, torture is against the law in Honduras, and the state has prosecuted police officers for torture and other abuses, including for one of the jail massacres; and (3) characterizing Cole as arguing that lack of medical care and poor prison conditions in Honduras amount to torture, held that Cole had failed to meet the standard of specific intent to cause harm established in *Villegas v. Mukasey*, 523 F.3d 984 (9th Cir. 2008). Although Cole argued that he would be *intentionally* denied medical care and that prison officials have *intentionally* created dangerous prison conditions, the IJ did not address these arguments.

Like the IJ, the BIA discounted Cole's expert witness testimony about the likelihood that Cole would be tortured on the ground that the expert failed to give specific examples corroborating his opinion. The Board also held, as did the IJ, that Cole had not established by sufficient evidence each link in the chain of events that could result in his torture by police, death squads, or other gang members. The BIA did recognize that evidence in the record suggested that "the presence of a

---

[6]Cole's applications for asylum and withholding of removal were also denied.

tattoo can cause an automatic association with gangs, and that a tattoo or suspected gang affiliation can equate to harsh treatment." But the BIA found nothing in the record explaining why Cole could not have his tattoos removed to avoid being perceived as a gang member. Finally, the BIA determined that lack of medical treatment is not tantamount to torture. The BIA did not make any finding regarding government acquiescence in torture by death squads or gang members.

Cole timely filed this petition for review.[7]

## II.

We review issues of law regarding CAT claims de novo. *Edu v. Holder*, 624 F.3d 1137, 1142 (9th Cir. 2010). "Where the BIA conducts its own review of the evidence and the law, this panel only reviews the BIA's decision, except to the extent it expressly adopts the IJ's decision." *Eneh v. Holder*, 601 F.3d 943, 946 (9th Cir. 2010). "The BIA's findings underlying its determination that an applicant is not eligible for relief under the CAT are reviewed for substantial evidence." *Arteaga v. Mukasey*, 511 F.3d 940, 944 (9th Cir. 2007). "Under the substantial evidence standard, the court upholds the BIA's determination unless the evidence in the record compels a contrary conclusion." *Id.*

---

[7]We note that Cole has been detained throughout these proceedings, which have lasted for more than three years, seemingly without a bond hearing. If so, then, as did the court in *Aguilar-Ramos v. Holder*, 594 F.3d 701 (9th Cir. 2010), "we express grave concerns over [Cole's three]-year detention," *id.* at 704 n.3, particularly given Cole's testimony that while in detention, he was not permitted the medications he needed to control the pain from his brain injury. Prolonged detention of aliens absent a bond hearing is not authorized by 8 U.S.C. § 1226(a). *See Casa-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 950-51 (9th Cir. 2008); *see also Prieto-Romero v. Clark*, 534 F.3d 1053, 1062 (9th Cir. 2008) (holding that a three-year detention "qualifies as prolonged by any measure"). "We encourage [Cole] to challenge his detention by filing a habeas petition pursuant to 28 U.S.C. § 2241 or by requesting a bond hearing." *Aguilar-Ramos*, 594 F.3d at 704 n.3.

"Because neither the BIA nor the IJ made an adverse credibility finding, 'we must assume that [Cole's] factual contentions are true.'" *Aguilar-Ramos*, 594 F.3d at 704 (quoting *Navas v. INS*, 217 F.3d 646, 652 n.3 (9th Cir. 2000)). "As a result, the facts to which [he] testified are 'deemed true, and the question remaining to be answered becomes whether these facts, and their reasonable inferences, satisfy the elements of the claim for relief.'" *Edu*, 624 F.3d at 1143 (quoting *Nuru v. Gonzales*, 404 F.3d 1207, 1216 (9th Cir. 2005)).

## III.

### A.   General CAT Principles

**[1]** To qualify for CAT relief, a petitioner must establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). In other words, Cole must "show only a chance greater than fifty percent that he will be tortured if removed to" Honduras. *Hamoui v. Ashcroft*, 389 F.3d 821, 827 (9th Cir. 2004). In determining whether an individual will more likely than not be tortured, "all evidence relevant to the possibility of future torture shall be considered." 8 C.F.R. § 1208.16(c)(3).

**[2]** Importantly, an application for CAT relief need not show that he will be tortured "on account of" any particular ground. *See Kamalthas v. INS*, 251 F.3d 1279, 1283 (9th Cir. 2001). Moreover, where torture is sufficiently likely, "CAT 'does not permit any discretion or provide for any exceptions.'" *Edu*, 624 F.3d at 1145 (quoting 64 Fed. Reg. 8478, 8481 (Feb. 19, 1999). Instead, the provision for deferral of removal under CAT applies to all applicants, even those who, like Cole, are former gang members convicted of an aggravated felony. *See* 8 C.F.R. § 208.17(a); *Lemus-Galvan v. Mukasey*, 518 F.3d 1081, 1083 (9th Cir. 2008) (holding that "even if an alien has been convicted of a 'particularly serious crime,' and is ineligible for withholding of removal under the

CAT, an IJ is required to grant deferral of removal if the alien can establish the likelihood of torture upon return"). As we explained in *Edu*, "the words of CAT . . . reach out to protect even the most vile of actors against state vileness." 624 F.3d at 1146. Indeed, "in adopting the [CAT] regulations, the agencies themselves recognized that even those who assisted in Nazi persecutions, or engaged in genocide, or pose a danger to our own security are not excluded from the protections of CAT." *Id.* at 1145. Futher, "[a foreign] government cannot exempt torturous acts from CAT's prohibition merely by authorizing them as permissible forms of punishment," *Nuru*, 404 F.3d at 1221, nor do other circumstances provide a justification for denying deferral of removal where torture is sufficiently likely.

**[3]** In other words, the policy against providing "sanctuary for universal outlaws" that led this court to conclude that gang members or former gang members are not a social group for the purposes of asylum and withholding of removal, *see Arteaga*, 511 F.3d at 946, does not preclude deferral of removal under CAT. Both the governing regulations and the case law of this circuit dictate that even gang members, both current and former, cannot be returned to a country in which they will more likely than not be tortured. *See* 8 C.F.R. § 208.17(a); *Arteaga*, 511 F.3d at 949.

"Acts constituting torture" under CAT "are varied, and include beatings and killings." *Bromfield v. Mukasey*, 543 F.3d 1071, 1079 (9th Cir. 2008). The implementing regulations define torture as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or

a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1). Acquiescence by government officials "requires only that [they] were aware of the torture but 'remained willfully blind to it, or simply stood by because of their inability or unwillingness to oppose it.' " *Bromfield*, 543 F.3d at 1079 (quoting *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1060 (9th Cir. 2006)). The torturer, whether a public official or a private party acting with the government's consent or acquiescence, must have the specific intent to inflict severe harm. *See Villegas v. Mukasey*, 523 F.3d 984, 989 (9th Cir. 2008).

## B. Expert Testimony

**[4]** Cole's CAT claim depends heavily on the testimony of two experts, Rodriguez and Canales, as well as on documentary evidence corroborating their testimony. In determining whether Cole had established that he would more likely than not be tortured if returned to Honduras, the BIA was required to evaluate the expert testimony, as well as the documentary evidence in the record.

CAT's implementing regulations so require: In making a CAT decision, the regulations state, *"all* evidence relevant to the possibility of future torture *shall be* considered, including . . . [e]vidence of gross, flagrant or mass violations of human rights within the country of removal . . . and . . . [o]ther relevant information regarding conditions in the country of removal." 8 C.F.R. § 1208.16(c)(3) (emphasis added). We therefore grant petitions for review in CAT cases where the BIA did not consider country conditions evidence in the record. *See Aguilar-Ramos*, 594 F.3d at 705 (remanding for the BIA to determine in the first instance whether the Country

Report demonstrates a likelihood of torture); *see also Bromfield*, 543 F.3d at 1077, 1079; *Al-Saher v. INS*, 268 F.3d 1143, 1147 (9th Cir. 2001). Indeed, "country conditions alone can play a decisive role in granting relief under the Convention." *Kamalthas*, 251 F.3d at 1280.

In *Aguilar-Ramos*, for example, the government argued that "the Board is not required to cite and refute explicitly every piece of evidence offered on appeal"; this court responded that "[t]he regulations implementing CAT explicitly require the IJ to consider 'all evidence relevant to the possibility of future torture,' " and also noted that country reports are accorded special weight in removal proceedings. 594 F.3d at 705 n.6 (citations omitted).

That is not to say that the BIA must discuss each piece of evidence submitted. When nothing in the record or the BIA's decision indicates a failure to consider all the evidence, a "general statement that [the agency] considered all the evidence before [it]" may be sufficient. *See Almaghzar v. Gonzales*, 457 F.3d 915, 922 (9th Cir. 2006). But, where there is any indication that the BIA did not consider all of the evidence before it, a catchall phrase does not suffice, and the decision cannot stand. Such indications include misstating the record and failing to mention highly probative or potentially dispositive evidence. *See Aguilar-Ramos*, 594 F.3d at 705 & n.6; *Eneh*, 601 F.3d at 948-49; *Bromfield*, 543 F.3d at 1076-77; *Kamalthas*, 251 F.3d at 1283-84.

**[5]** In particular, where potentially dispositive testimony and documentary evidence is submitted, the BIA must give reasoned consideration to that evidence. *See Eneh*, 601 F.3d at 948-49. We granted the petition for review in *Kamalthas*, for example, because the BIA did not "consider probative evidence in the record of country conditions which confirm[ed]" torture of individuals with characteristics similar to the petitioner. 251 F.3d at 1284.

**[6]** Here, the BIA neither asserted that it had considered all of the evidence nor evidenced in its opinion reasoned consideration of the potentially dispositive testimony of Cole's two experts. Instead, the BIA stated only that the testimony of *one* of Cole's experts "was unpersuasive in light of the other evidence, including the State Department report, . . . because [he] failed to give specific examples to corroborate his opinion." In so stating, the BIA did not clarify to which of Cole's experts it was referring; nor did it address the other expert's testimony at all. In other words, the Board did not evidence reasoned consideration of the testimony of Cole's *two* experts.

Further, as to whichever expert the BIA opinion did reference, the Board was obliged to "state[ ] reasons in the record why the testimony was insufficient to establish the probability of torture necessary to grant CAT relief." *Aguilar-Ramos*, 594 F.3d at 706 n.7. It did not do that.

**[7]** The BIA's sole stated rationale for rejecting the one expert's opinion is entirely unsupported by the record for two reasons. First, although the Board opined that the expert's testimony was "unpersuasive in light of the other evidence," specifically the State Department report, in fact that report corroborates rather than contradicts many aspects of both experts' testimony. For example, although the 2008 report noted that torture was illegal in Honduras,[8] it also stated that human rights problems in Honduras included "unlawful killings by members of the police and government agents; arbitrary and summary killings committed by vigilantes and former members of the security forces; violence against detainees by security forces; harsh prison conditions; [and] corruption and impunity within the security forces." The State Department report also noted that there are instances in which

---

[8]That a country's constitution prohibits torture does not establish that the country does not torture people. *See Al-Saher*, 268 F.3d at 1147 (stating that the country report noted that the Iraqi Constitution prohibited torture but reported that security forces routinely tortured detainees).

government officials beat and abuse detainees, and that human rights groups had reported over two dozen instances of torture due to one government initiative.[9] Additionally, the 2008 report acknowledged that police arrest individuals for having certain types of tattoos. Thus, while the report indicated that some officials are being investigated and convicted for abusing their authority, it also noted ongoing serious problems and so corroborated the experts' testimony. Further, as noted above, other documentary evidence corroborated their testimony as well.

Moreover, contrary to the Board's assertion, the experts, in particular Canales, did testify about specific incidents of police torturing or killing suspected gang members. For example, Canales discussed an incident in which 68 suspected gang members were shot in jail by "members of the police guard"; an incident in which police set fire to a jail and killed 104 gang members; and an incident involving a police officer who tortured two gang members to death. Canales also testified that he had personally experienced police brutality, and personally witnessed tattooed individuals being denied medical care at public hospitals. Finally, Canales attempted to quantify the risk Cole faced if returned to Honduras, placing his risk of detention by the police at 90% and his risk of being killed by other gang members at 75%. The Board did not acknowledge these examples and estimates.

[8] The government argues that Canales' testimony should be discounted because he did not work with former members of the Crips gang and had very little first-hand knowledge regarding how former members of that particular gang are treated in Honduras. Canales' lack of knowledge about the Crips gang does not mean, however, that his testimony is inapplicable to Cole. As the BIA recognized, evidence in the

---

[9]The 2007 State Department report, also in the record, placed the number of individuals arbitrarily arrested and sometimes tortured at more than 34,000.

record demonstrates that tattoos "can cause an automatic association with gangs," which can "equate to harsh treatment." There is no record evidence suggesting that Cole would experience different treatment because his tattoos are affiliated with the Crips rather than with the gangs with which Canales primarily works. Moreover, Canales' testimony about violence perpetrated by gang members on those they suspect of being rivals should have been evaluated alongside Rodriguez's testimony, which focused on the rivalries between the Crips and the two dominant gangs in Honduras, MS-13 and 18th Street. Because the BIA acknowledged the testimony of only one of Cole's experts, it appears that it never considered Cole's CAT claim in light of the evidence presented by *both* experts.

**[9]** Because the BIA mischaracterized the record with regard to one of the expert's consistency with the State Department reports, criticized that expert's testimony on a basis belied by the record, and failed even to acknowledge Cole's other expert witness, it failed to give reasoned consideration to the potentially dispositive testimony of Cole's two experts. We must therefore remand for the agency to reconsider Cole's CAT claim in light of the expert testimony and the corroborating documentary evidence. *See INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam); *see also Aguilar-Ramos*, 594 F.3d at 705; *Eneh*, 601 F.3d at 948-49.

## C. Intentional Denial of Medical Care

In addition to its errors regarding the testimony of Cole's expert witnesses, the BIA also failed to consider Cole's claim that he would face torture in Honduras as a result of *intentional* denial of medical care.

**[10]** The applicable CAT regulations require that the torturer have the specific intent to inflict severe harm. 8 C.F.R. § 1208.18(a)(5). Acts that merely have the foreseeable result of inflicting harm are not sufficient; "the actor [must] intend

the actual consequences of his conduct." *Villegas*, 523 F.3d at 989. Thus, inhumane conditions and lack of access to appropriate medical care do not, in and of themselves, constitute torture. *Id.*; *Eneh*, 601 F.3d at 948. The IJ and BIA were therefore correct that a claim of inadequate health care in Honduras, without more, is insufficient to warrant CAT relief.

**[11]** This court has recognized, however, that the *intentional* denial of medical care as a form of punishment could suffice to establish a CAT claim. *Eneh*, 601 F.3d at 948. Here, the BIA did not consider at all Cole's claim that medical care would be *intentionally* withheld because of his gang tattoos, and that he, specifically, was likely to need medical care due to his brain injury.[10] There is at least some evidence supporting Cole's contentions: Canales testified that he had personally witnessed staff at public hospitals let a victim bleed to death because he had tattoos. His opinion was that Cole, also tattooed, would similarly be denied emergency medical care in Honduras and would have only contingent, restricted access to other medical care. The BIA should have considered whether that was so, particularly given evidence in the record that Cole will need medical care in Honduras to deal with complications from his brain injury.

## D.   Tattoo Removal

Additionally, the BIA's conclusion that Cole did not meet his burden under CAT rested in part on its assertion that Cole

---

[10]Cole also argues that the BIA inadequately considered his claim that prison officials would intentionally allow him to be tortured and killed in prison by rival gang members. The agency found that Cole had failed to establish that he would more likely than not come to the attention of police and be detained in prison, and so did not consider what would happen were he detained. If, after reasoned consideration of potentially dispositive testimony and documentary evidence, the BIA reconsiders its conclusion regarding the likelihood that Cole will come to the attention of the police and be detained, it should address his claim that prison officials will *intentionally* subject him to dangerous conditions amounting to torture.

could "have his tattoos removed so that he would not be perceived as a gang member upon return to Honduras." Given that statement, we cannot tell whether the BIA would have reached the same result had it not assumed that the tattoos could feasibly be removed in a timely manner.[11] But that assumption falters if the record evidence on the issue is credited: There is evidence that the tattoo removal process is quite long and extremely painful. Moreover, the process can leave permanent scarring. Canales also testified that there is a far greater demand for tattoo removal in Honduras than there are places that can provide such services, leading many tattooed individuals to resort to dangerous home remedies such as burning themselves with cigarette butts or battery acid. Added to likely lengthy delay in beginning tattoo removal is the length of time it takes to remove tattoos once the process begins. As a result of these circumstances, Cole would likely be unable to remove his tattoos until well after his arrival in Honduras, and thus would face being perceived as a gang member for as long as it took — likely quite a while — to get them removed. And even after getting his tattoos removed, the record indicates, visible scarring could mean that he would still be a targeted by rival gangs, police, and death squads.

[12] The BIA's statement concerning tattoo removal does not discuss any of this evidence or explain why it is not dispositive. Thus, once again, the BIA did not give reasoned consideration to potentially dispositive testimony with regard to the probability of torture, and we must remand for further consideration and explanation.

---

[11]It is also unclear whether, if it were feasible for Cole to remove his tattoos sufficiently to reduce his risk of torture, the BIA could deny CAT relief on that basis. The issue is not squarely before us, so we need not, and do not, address it.

## E.    Aggregation of Risk

**[13]** Finally, the BIA did not consider the *aggregate* risk that Cole would face from police, death squads, and gangs if returned to Honduras. Cole need not prove that each group, treated individually, would more likely than not torture him. Rather, he must establish that, taking into account all possible sources of torture, he is more likely than not to be tortured, by or with the consent or acquiescence of the government, if returned to Honduras. The BIA erred by treating each potential source of torture individually, never assessing Cole's overall risk of being tortured.

## IV.

The BIA did not give reasoned consideration to potentially dispositive testimony by Cole's expert witnesses, corroborating documentary evidence, or evidence concerning removal of tattoos. Nor did it address Cole's argument regarding the intentional denial of medical care or assess Cole's risk of torture in the aggregate. We therefore **GRANT** Cole's petition, **VACATE** the BIA's decision, and **REMAND** for further proceedings consistent with this opinion.

**VACATED and REMANDED.**

NOONAN, Circuit Judge, concurring:

Cole's peril comes from his possession of tattoos. Before exposing him to that peril, he should be given the chance to remove the tattoos. The Board of Immigration Appeals has the discretion, in these extraordinary circumstances, to defer his deportation until the tattoos are removed. *See Barapind v. Reno*, 225 F.3d 1100, 1113 (9th Cir. 2000). Accordingly, I vote to remand to the BIA to exercise this discretion.

If the BIA does exercise this discretion and the tattoos are removed, or if Cole declines to seek removal of the tattoos, I vote to deny Cole any further delay in his deportation. If the BIA does not exercise its discretion or if the tattoos are not removed, I concur in Judge Berzon's opinion.

CALLAHAN, Circuit Judge, dissenting:

I dissent because the majority, in reviewing Cole's assertion that he will be tortured if returned to Honduras because of his gang tattoos, improperly substitutes its judgment for that of the BIA. Specifically, the majority: (1) manufactures a procedural basis for remand by deciding that the BIA failed to give "reasoned consideration" to Cole's evidence; (2) fails to follow the standard for granting relief under the Convention Against Torture ("CAT"), *see Arteaga v. Mukasey*, 511 F.3d 940, 944 (9th Cir. 2007), by reweighing the evidence and stringing together a series of hypothetical events to justify its conclusion that Cole may be tortured if returned to Honduras because he would be misidentified as being a gang member based on his tattoos; (3) fails to appreciate the lack of evidence that Cole would be intentionally deprived medical care if he were returned to Honduras; and (4) accepts Cole's problematic argument that he may be entitled to CAT relief on the basis of his gang-related tattoos. I would deny Cole's petition on the basis that substantial evidence supported the BIA's decision and nothing Cole presented in his petition compels a contrary result.

## I

Neither the IJ nor the BIA made an adverse credibility finding, therefore we take Cole's factual allegations as true. *Aguilar-Ramos v. Holder*, 594 F.3d 701, 704 (9th Cir. 2010). Because of his criminal background, the IJ and BIA concluded that Cole is not entitled to either asylum or withhold-

ing of removal. Cole does not challenge these decisions. Rather, the only issue before this court is his assertion that he is entitled to protection under CAT.

## A

### 1.  Cole's Background and Testimony

Cole is a native and citizen of Honduras who entered the United States with his family when he was eleven years old and has since acquired a lengthy criminal record. He has no extended family in Honduras. Cole is African-American and has numerous gang tattoos on his arms, legs and face that he acquired while in prison after he joined the Crips, an African-American gang. After his release from prison, Cole apparently left the gang and worked for a homeless services agency. He states he did not get the gang tattoos removed because tattoo removal is a long and painful process.

In 2007, Cole was shot in a drive-by shooting.[1] As a result of the shooting, he suffers from certain ongoing medical problems and has a defective, fragile skull.

In 2008, because of a 1999 conviction for possession of cocaine for sale, Cole was placed in removal proceedings where he sought asylum, withholding of removal, and CAT relief. The IJ determined that Cole was removable as an aggravated felon and therefore ineligible for asylum and with-

---

[1]Although the majority asserts that "rival gangs could still identify him as a Crips gang member because of his tattoos," Cole never testified that any rival gang ever identified him as a gang member, whether because of his tattoos or not. Cole testified about a confrontation with rival gang members at the Santa Monica Pier while he was with friends, but he did not assert that any of the rival gang members recognized him as a Crip or that anyone noticed his tattoos. Similarly, when Cole was shot, he was with a friend in his car and although he claimed that the people who shot him identified themselves as members of a Hispanic gang, Cole does not state that any mention was made of his race or his gang tattoos.

holding of removal. Cole did not contest those decisions before the BIA.

At his immigration hearing, Cole testified that he feared he would be tortured or killed if he were returned to Honduras. He asserted that gangs, police, death squads, or even his neighbors may torture or kill him because of his race, gang tattoos, former gang membership, demeanor or accent, and that the torture and killing would be done with the acquiescence of the government.[2] Cole's sister and mother also testified that they feared he would be tortured or killed if returned to Honduras on the basis of his race and tattoos. In addition, Cole claimed that he would be intentionally denied medical care by public health officials and that this denial of health care would constitute torture.

## 2.  Cole's Experts

Cole supported his claim with testimony from two purported experts: Luis Javier Rodriguez ("Rodriguez") and Javier Canales Mesa ("Canales"). Rodriguez was offered as an expert on Central American gangs. Rodriguez testified that he was a self-employed author who had not written about Honduras and had no specific education, background, or expertise on the subject of Honduras or gangs in Honduras. The IJ was not convinced that Rodriguez was an expert on Central American gangs or had any specialized knowledge on the interaction between Honduran former gang members and the Honduran authorities, but permitted Rodriguez to testify as an expert on gangs and on the narrow issue of racial dynamics between Los Angeles and Central American gangs.

---

[2]Although Cole's race is a factor, there is little discussion of race in the proceedings, and neither Cole nor the majority contend that he would be tortured based on his race alone. Rather, Cole's race is raised as an additional way that Hispanic gang members, death squads, the police, or medical authorities may recognize Cole as a Crip. It is only the combination of Cole being an African-American with Crips tattoos that would make him identifiable as a (former) Crip.

Rodriguez testified that the major gangs in Honduras are the Hispanic gangs, Mara Salvatrucha, also known as MS-13, and the Mara 18, also known as the 18th Street, which are American gangs that have spread to Central America. He stated that the Crips are an African-American gang from Los Angeles. He testified that, in Los Angeles, the Crips are viewed as rivals to the Hispanic gangs. Rodriguez asserted that, in the United States, gang members may recognize rival gang members' tattoos, which can lead to violence. He speculated that the rivalry between the Hispanic gangs and the Crips would exist in Honduras and that someone with Crips tattoos might be "threatened, beaten, or killed" by the Hispanic gangs there if rival gangs were to see the Crips tattoos. Rodriguez also testified that there is a "very strong anti-black culture" in Honduras.

Rodriguez testified that gang members obtain tattoos as a means of identifying their affiliation with a particular gang. He stated that removing tattoos is an expensive and painful process that could take several sessions and could leave scarring. He testified that tattoo removal was possible in Honduras, but that he knew of only two facilities and they lacked adequate personnel and equipment, so there was a backlog of people wanting to get their tattoos removed.

The IJ accepted Cole's second expert, Canales, as an expert on the issue of the treatment of suspected gang members by Honduran police and rival gang members. Canales had worked with former gang members in Honduras. He testified that because Cole's gang tattoos indicate his membership in the Crips, Cole may be seen as a threat to some Honduran Hispanic gang members and accordingly there was a "big possibility" that Cole could be killed. However, on cross-examination, Canales admitted that he had not worked with any Crips. Canales testified that former Honduran gang members often try to remove their tattoos because of the risk of violence from rival gangs, police, and "civil groups." He stated that some individuals try to remove the tattoos them-

selves, although there are three tattoo removal places in Honduras that will professionally remove tattoos.[3] He claims that it takes four to six sessions to remove a tattoo and that it is a painful process which may result in scarring.

Canales stated that it is illegal in Honduras to be a gang member or to have a gang-related tattoo. He asserted that the government does not investigate the murders of gang members and that the police will direct violence at suspected gang members, or may even kill them. In addition, Canales testified about incidents in which Honduran police or prison guards killed suspected gang members in prison. He also testified that government-sanctioned death squads torture and kill undesirables, including suspected gang members. Canales opined that because of his tattoos, Cole has a greater than 75% chance he will be killed by Hispanic gang members and a 90% probability that he would be detained by police.

Finally, Canales testified that most health care professionals in Honduras would refuse to treat an individual with tattoos because they would suspect he is a gang member. Canales provided one example in which he stated that he accompanied a bleeding tattooed gang member to a hospital and that this individual died in the waiting room because the staff would not treat the man on account of his tattoos. Canales asserted that the government is "negligent" because it does not hold doctors accountable and "these events occur very often."

**B**

### 1.  The IJ's Decision

The IJ denied Cole's application for relief under CAT. The

---

[3]It appears that the third program is run by doctors who come to Honduras every couple of months from the United States. They typically remove 90% of a tattoo in four sessions.

IJ considered both the documentary evidence and witness testimony and discussed the arguments raised by both Cole and the government.

The IJ recognized that torture is an extreme form of punishment and that "an alien cannot establish eligibility for [CAT relief] by stringing together a series of suppositions to show that it is more likely than not that torture will result where the evidence does not establish each step in the hypothetical chain of events is more likely than not to happen." The IJ found that Cole was attempting to do just that, by asserting:

> that it is more likely than not that he will be arrested in Honduras and that once he is arrested, he will be detained for a substantial amount of time and if so detained, he will then be killed or tortured by the security forces or he will receive no medical care or the gangs will kill or torture him with the government's acquiescence.

The IJ concluded that although there was "evidence that arrests, abuse, and killings occur, the evidence does not show that it is more likely than not to happen to the respondent." The IJ noted that, according to the Country Report, torture is illegal in Honduras. Further, "neither the witnesses [n]or the documentary evidence presented in the case establishes that a majority of deported gang members are in fact arrested by the police, held in custody, and tortured or killed."

The IJ rejected Cole's assertion that "the lack of medical care and poor prison conditions are specifically intended to inflict severe physical or mental pain and suffering," or that the government intended those consequences. The IJ, citing *Villegas v. Mukasey*, 523 F.3d 984 (9th Cir. 2008), found that Cole was "unable to show that Honduras has a specific intent to inflict suffering on prisoners or patients or suspected gang members by creating the conditions in their jails or medical facilities."

Finally, the IJ concluded that:

> The respondent also has not shown that the government of Honduras will acquiesce in his torture at the hands of other gang members or the death squads nor has he established that it is more likely than not to occur to him. It is not enough to show that gang members have killed other gang members or that death squads have tortured and killed gang members.
>
> . . . The evidence does not establish that the government acquiesces in such conduct and in fact, reflects the opposite. The government is trying to handle the huge gang problem they face and are attempting to receive specialized training. They are taking steps to prosecute police officers for abuse of power. Accordingly, the Court finds that the respondent is unable to establish a likelihood of torture in Honduras by either the government or with the government's acquiescence . . . .

### 2. The BIA's Decision

In October 2009, the BIA, in a single judge decision, affirmed the IJ. The BIA agreed with the IJ that Cole:

> failed to meet his burden of proving that it is more likely than not that he will be tortured based on his race and gang related tattoos and former gang member status upon return to Honduras. *See* 8 C.F.R. § 1208.16-18; *Arteaga v. Mukasey*, 511 F.3d 940 (9th Cir. 2007). The Immigration Judge properly concluded that the expert witness's claim that the respondent will be tortured was unpersuasive in light of the other evidence, including the State Department report, contained in the record because the respondent's expert failed to give specific examples to corroborate his opinion; the record does not com-

pel a contrary conclusion. *See Dukuly v. Filip*, 553 F.3d 1147 (9th Cir. 2009); *Shehu v. Gonzales*, 443 F.3d 435 (5th Cir. 2006). He further properly determined that the evidence does not establish that each event in the chain of events proposed by the respondent is more likely than not to occur. *Matter of J-F-F-*, 23 I&N Dec. 912 (A.G. 2006); 8 C.F.R. §§ 1208.16-.18. For example, the evidence does not establish that, as a black, tattooed, ex-gang member, it is more likely than not that the police would become aware of the respondent's return to Honduras, that upon becoming aware of him, it is more likely than not that the police would detain him, and that it is more likely than not that, once the respondent was detained, they would use physical force against the respondent that would rise to the level of torture. *Id.* Likewise, the respondent failed to meet his burden of proving that it is more likely than not that a death squad, rival gang members, or any other entity would become aware of his return to Honduras and that it is more likely than not that any of these groups would then torture him. Additionally, the respondent submitted numerous articles which detail that the presence of a tattoo can cause an automatic association with gangs, and that a tattoo or suspected gang affiliation can equate to harsh treatment. However, there is no indication that the respondent could not have his tattoos removed so that he would not be perceived as a gang member upon return to Honduras. Finally, we cannot conclude that the lack of medical treatment to the respondent is tantamount to torture. Although the respondent has shown that he faces some risks of harm when returned to Honduras, the Immigration Judge properly determined that the testimony and evidence does not establish that he will "more likely than not" be tortured.

Cole timely petitioned this court for review. In his petition, Cole alleged that the BIA erred by (a) failing to give proper

weight to his experts' testimony; (b) finding that he had failed to establish a clear probability of future torture by the police, rival gang members, or death squads; (c) failing to consider Cole's prison conditions and denial of medical care claims; and (d) failing to give proper weight to Cole's evidence he will be tortured because the BIA found Cole could remove his tattoos.

## II

Our review focuses on the BIA's single-member decision but we look to the IJ's decision "as a guide to what lay behind the BIA's conclusion." *Delgado v. Holder*, 563 F.3d 863, 866 (9th Cir. 2009) (quoting *Avetora-Elisseva v. INS*, 213 F.3d 1192, 1197 (9th Cir. 2000)).

We review factual determinations supporting the denial of CAT relief under a deferential substantial evidence standard. *See Arteaga*, 511 F.3d at 944 ("[t]he BIA's findings underlying its determination that an applicant is not eligible for relief under the CAT are reviewed for substantial evidence"). Under this standard, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be *compelled* to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (emphasis added); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992) ("To reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it."). This court "must uphold the IJ's determination if it is supported by reasonable, substantial, and probative evidence in the record." *Halim v. Holder*, 590 F.3d 971, 975 (9th Cir. 2009) (quoting *Zehatye v. Gonzales*, 499 F.3d 1182, 1185 (9th Cir. 2006).

We have held that "[t]his strict standard bars the reviewing court from independently weighing the evidence and holding that the petitioner is eligible for asylum, except in cases where compelling evidence is shown." *Kotasz v. I.N.S.*, 31 F.3d 847, 851 (9th Cir. 1994). "We are not free to look anew at the testi-

mony and then measure the soundness of the agency's decision by what we would have found. Nor does evidence compel the opposite conclusion just because it would also support a different result." *Donchev v. Mukasey*, 553 F.3d 1206, 1213 (9th Cir. 2009).

To be eligible for deferral of removal under the CAT, the applicant must establish that he would more likely than not be tortured at the instigation of, or with the consent or acquiescence of, a public official. *See* 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1); *Kamalthas v. INS*, 251 F.3d 1279, 1282 (9th Cir. 2001). The "consent or acquiescence" requirement means that the government must be aware of the allegedly tortuous conduct, or at least willfully blind to it. *Zheng v. Ashcroft*, 332 F.3d 1186, 1188-89 (9th Cir. 2003) (citation omitted).

The applicable regulation, 8 C.F.R. § 1208.18(a)(1) states:

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . , when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*See also Kamalthas*, 251 F.3d at 1282; *Sinha v. Holder*, 564 F.3d 1015, 1026 (9th Cir. 2009). In addition, "[t]orture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 1208.18(a)(2). Furthermore, "[t]orture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions." 8 C.F.R. § 1208.18(a)(2); *Al-Saher v. I.N.S.*, 268 F.3d 1143, 1147 (9th Cir. 2001).

## III

Applying the applicable standard of review, the majority commits four errors in granting Cole's petition. First, the

majority manufactures a procedural basis for remand by concluding that the BIA failed to give "reasoned consideration" to Cole's experts' testimony and evidence related to Cole's ability to get his tattoos removed. Second, the majority impermissibly (a) reweighs the evidence, *see, e.g.*, *Kotasz*, 31 F.3d at 851; and (b) strings together a series of hypothetical events, related to Cole's claim that he will be misidentified as being a gang member and then tortured by rival gangs, police, or death squads, none of which is more likely than not to occur. *See Matter of J-F-F-*, 23 I&N Dec. 912 (A.G. 2006). Third, the majority misreads the record in concluding that the BIA did not adequately consider whether Cole would be *intentionally* deprived of medical care if he were returned to Honduras. Fourth, the majority decision allows a petitioner to obtain CAT relief on the basis of having voluntarily obtained a gang-related tattoo. This is problematic for a number of reasons, not the least of which is that it appears to undermine our holding in *Arteaga*, 511 F.3d 940, that being a tattooed ex-gang member does not constitute belonging to a particular social group.

## A

The majority manufactures a procedural basis for remand by deciding that the BIA failed to give "reasoned consideration" to "the potentially dispositive testimony" of both of Cole's experts. Maj. Op. at 17975, 17978-79. Contrary to the majority's perspective, the BIA and IJ considered all of Cole's evidence.

### 1. The BIA Considered Both Experts' Testimony

The majority finds the BIA erred because "the BIA stated only that the testimony of *one* of Cole's experts 'was unpersuasive in light of the other evidence, including the State Department report, . . . because [he] failed to give specific examples to corroborate his opinion.' " The majority claims that the BIA failed to address Cole's other expert at all. Maj. Op. at 17975-77. The majority professes not to know which

expert the BIA was referring to, but concludes that whichever expert it was, the BIA was obligated to state the reasons " 'why the testimony was insufficient to establish the probability of torture necessary to grant CAT relief.' " *Id.* (quoting *Aguilar-Ramos*, 594 F.3d at 706 n.7). This is not a fair reading of the record.

The BIA stated that "[t]he Immigration Judge properly concluded that the expert witness's claim that the respondent will be tortured was unpersuasive in light of the other evidence, including the State Department report, contained in the record because the respondent's expert failed to give specific examples to corroborate his opinion . . . ." Only two experts testified — Rodriguez, who primarily testified about the racial dynamics of Los Angeles gangs spreading to Central America, rather than about Cole being tortured in Honduras, and Canales, who testified extensively about the various ways that Cole might be tortured. In context, it is clear that the BIA was specifically referring to Canales's testimony.[4]

Furthermore, we do not review the BIA's decision in a vacuum, but rather look to the IJ's decision "as a guide to what lay behind the BIA's conclusion." *Delgado*, 563 F.3d at 866 (quoting *Avetova-Elisseva*, 213 F.3d at 1197). The BIA's decision generally affirmed the IJ's decision and the IJ explicitly discussed both Canales's and Rodriguez's testimony, before concluding that "neither the *witnesses* [n]or the documentary evidence presented in the case establishes that a majority of deported gang members are in fact arrested by the police, held in custody, and tortured or killed." It is clear that the IJ considered both of Cole's experts' testimony, but found other evidence more compelling, and it is equally clear that the BIA considered the IJ's decision and affirmed on the same basis.

---

[4]Another possibility, not considered by the majority, is that the BIA's statement is a typographical error: the BIA failed to pluralize "witness", writing "witness's" when it actually meant "witnesses' " which would render the majority's argument moot.

The majority asserts that the BIA's "rationale for rejecting one expert's opinion is entirely unsupported by the record for two reasons": (1) the State Department report "corroborates rather than contradicts many aspects of both experts' testimony"; and (2) the experts "did testify about specific incidents of police torturing or killing suspected gang members." Maj. Op. at 17975-76. The majority cites examples from the report and from Canales's testimony in support of these contentions. *Id.* at 17976-77.

The majority, however, overlooks the documentary evidence and testimony supporting the opposite conclusion.[5] The BIA stated:

> the evidence does not establish that, as a black, tattooed, ex-gang member, it is more likely than not that the police would become aware of the respondent's return to Honduras, that upon becoming aware of him, it is more likely than not that the police would detain him, and that it is more likely than not that, once the respondent was detained, they would use physical force against the respondent that would rise to the level of torture. *Id.*

The IJ found that "[n]either the witnesses [n]or the documentary evidence presented in this case establishes that a majority of deported gang members are in fact arrested by the police, held in custody, and tortured or killed." The IJ noted that, "[h]ere, the Department of State report for Honduras reflects that torture is against the law," and observed that:

---

[5]In addition to Cole's testimony, over 700 pages of documents were submitted by the parties, including newspaper articles regarding gang violence in the United States and Honduras, general research articles related to gang issues in the United States and Honduras, Department of State Human Rights Reports and Country Reports for 2007 and 2008, a summary of criminal proceedings against Cole, as well as Cole's medical history related to his gunshot wound.

The report reflects that the public ministry has filed charges against police officers for torture and illegal detention and that an office of internal affairs has been created. There is a special prosecutor for human rights and charges against the police have been found to have merit. Members of the government, including the chief of police of Lasaba and the police commissioner have been prosecuted and sentenced for the Porvener Jail massacre and authorities prosecuted 268 police officers for offenses ranging from abuse of authority to drug trafficking, rape, and homicide. Furthermore, the evidence reflects that Honduras is one of the poorest countries in the hemisphere and therefore, a lack of resources remains a problem.

A review of the 2008 Country Report (the most current at the time of Cole's hearing) supports the IJ's and BIA's conclusions. That report noted that the Honduran constitution and law prohibit torture. In addition, arbitrary arrest and detention are prohibited by the Honduran constitution and other laws. Regarding arrests, the State Department Human Rights report states that:

The law states that police may arrest a person only with a court order, unless the arrest is by order of a prosecutor, made during the commission of a crime, made when there is strong suspicion that a person has committed a crime and may try to evade criminal prosecution, or made when the person is caught with evidence related to a crime. Police must clearly inform the person of the grounds for the arrest. Police must bring a detainee before a competent authority within 24 hours. The prosecutor has 24 hours to decide if there is probable cause for an indictment, and a judge then has 24 hours to decide whether to issue a temporary detention order that can last up to six days, by which time the judge must

hold a pretrial hearing to examine probable cause and make a decision on whether pretrial detention should continue.

Further, while the reports document instances of abuses committed by police and prison authorities, they also document the government's efforts to investigate prison officials who allegedly abused their authority, and note that twenty-one members of the government, including a chief of police and a police commissioner, had been convicted for their part in a jail "massacre" in 2003. The State Department's Human Rights report noted that "[t]he Office of Internal Affairs investigates allegations of illegal activities committed by members of the police force. The Preventive Police and the DGIC each have an office of professional responsibility that conducts internal reviews of police." Other evidence also supports the conclusion that the Honduran government investigates and prosecutes police officers accused of wrongdoing. And Honduras has sought assistance in training its law enforcement and military: "Foreign donors and international organizations provided human rights training to police and military officials." There was also evidence that the government actively investigated and prosecuted gang members. The 2007 Congressional Research Service report documented the government's efforts to crack down on gang members and noted that Honduras had received assistance in its efforts from several U.S. agencies.

In sum, it appears that the BIA's rationale for rejecting Cole's evidence is supported by the record. When presented with a record containing conflicting evidence, we are restrained to determine only whether the agency's decision is supported by substantial evidence. *See, e.g.*, 8 U.S.C. § 1252(b)(4)(B); *see also Elias-Zacarias*, 502 U.S. at 481 & n.1; *Halim*, 590 F.3d at 975.

**B**

The above discussion of the majority's alleged procedural errors implicates a more fundamental issue: there is no com-

pelling evidence that Cole will be tortured by rival gangs, death squads, or the police on the basis of being misidentified as a gang member because of his tattoos.

The majority suggests that Cole may be identified by rival gangs because of his tattoos, and that if he were identified as a rival gang member, he would be in peril of being tortured or killed by them. *See* Maj. Op. at 17964, 17965, 17976-77, 17979. This assumes that a Honduran gang would recognize Cole's tattoos and consider him a rival.[6] But there is no evidence that the Crips operate in Honduras. The majority also assumes that Honduran gangs will direct violence against Cole even though he is a former member of a gang that does not operate in Honduras. Furthermore, even if all of these possibilities were considered probabilities, it is only "torture" for the purposes of CAT relief if the Honduran government condones or acquiesces in such gang activity.

There is evidence in the record that the Honduran government does not condone gang activity. For example, Canales testified that being a member of a gang is a crime in Honduras and that the police will detain and arrest gang members. There is also documentary evidence that the police investigated and prosecuted suspected gang members.

This, however, is not evidence that Cole will be tortured by the police or prison officials because he is misidentified as being a gang member based on his Crips tattoos. Although there was evidence that having gang-related tattoos can lead to imprisonment in Honduras, *see* Maj. Op. at 17964, 17967, Cole is a *former* member of a gang — a gang that does not

---

[6]Neither of Cole's experts testified that Honduran gangs would assault Cole because of his tattoos. Rodriguez testified that rival gangs in the United States "may recognize rival gang members' tattoos," and admitted that he had no specific knowledge about gangs in Honduras. Canales, who worked with former gang members in Honduras, testified that Cole, because of his tattoos, may be seen as a threat by a Honduran gang.

operate in Honduras — and there is no evidence that the police or prison authorities would continue to detain a person who they mistakenly identified as a gang member.[7] Even if the police and prison officials did detain or imprison Cole, neither of these acts by themselves constitute torture. *See,* e.g., 8 C.F.R. § 1208.18(a)(3) ("Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions."); *Prasad v. INS*, 47 F.3d 336, 339-40 (9th Cir. 1995) (no past persecution where the petitioner was arrested once, detained for four to six hours and beaten).

The majority cites Canales's testimony and documentary evidence that Honduran police physically abuse suspected gang members. *See* Maj. Op. 17965. Similarly, the majority discusses evidence of violent acts directed at prisoners, including gang members. *Id.* at 17965, 17967-69, 17976. However, there was also evidence in the record that tended to show that the Honduran government neither instigates nor acquiesces in such behavior by police officers and that it prosecutes police officers who violate the law. Moreover, evidence that the Honduran government opposes gangs is not evidence that it would condone violence against a person misidentified as a gang member or would torture such a person.

Cole's argument that he will be tortured by death squads, with the government's acquiescence, also lacks compelling evidence. Cole must show that the government "is unwilling or unable to control those elements of its society responsible

---

[7]It seems questionable that having a gang-related tattoo that was obtained in another country and has no relationship to gangs that are active in Honduras would be considered to be illegal and would lead to Cole's detention and torture. The State Department Human Rights report sets forth the procedures for arresting a suspect, which include the prosecutor determining whether there is probable cause for an indictment and a requirement that the suspect be brought before a judge for a probable cause determination. Accordingly, it is unlikely that Cole would be arrested, detained, processed by a prosecutor and a judge, and then tortured by police on the basis of his American gang tattoos.

for targeting a particular class of individuals." *See Avetova-Elisseva v. INS*, 213 F.3d 1192, 1196 (9th Cir. 2000) (citation and internal quotation marks omitted). The majority notes Canales's testimony that death squads, comprised of "police and other powerful citizens" kill suspected gang members with "complete impunity," as well as documentary evidence of killings committed by "vigilantes." Maj. Op. at 17965, 17967. But other than the possibility of someone recognizing Cole's tattoos as gang tattoos, the majority does not explain how Cole might come to the attention of these groups. Furthermore, because Cole is not a member of a Honduran gang, there is no evidence that such groups — with or without the government's acquiescence — would torture Cole once the misidentification became known.[8] Also, there is evidence that the government prosecuted government officials who violated its laws.

In sum, the majority does not point to any compelling evidence that individuals such as Cole — who are tattooed ex-gang member deportees to Honduras — have come, or are more likely than not to come, to the attention of rival gangs, police, or death squads and are then tortured at the instigation of, or with the acquiescence of, the government. It is only by taking a number of hypothetical events and then assuming that each one of them inexorably leads to the next hypothetical event in the sequence, that one can reach the conclusion that it is more likely than not that Cole will be tortured if he is returned to Honduras.

The majority does just that. It strings together a series of hypothetical events to reach a thoroughly speculative conclusion. *Matter of J-F-F-*, 23 I&N Dec. at 917-18 ("The evidence does not establish that any step in this hypothetical chain of

---

[8]Indeed, the facts that Cole is an African-American and that his tattoos do not indicate membership in a Honduran gang — which appear to be primarily of Hispanic ethnicity — suggest that he is not likely to be a target of death squads or vigilantes.

events is more likely than not to happen, let alone that the entire chain will come together to result in the probability of torture of respondent."); *see also Savchuck v. Mukasey*, 518 F.3d 119, 123-24 (2d Cir. 2008) (holding that a series of hypothetical events related to the petitioner's economic hardship if returned to the Ukraine were too speculative to establish that he would be tortured under CAT). The majority cannot, and does not, point to any compelling evidence that Cole will be misidentified as a gang member on the basis of his tattoos or that this misidentification is likely to lead to his being tortured at the instigation of, or with the acquiescence of, the government.

## C

The majority concedes that for Cole's claim that he may be denied medical care to rise to the level of torture for CAT purposes, he must show that the denial is *intentional*.[9] Maj. Op. at 17977-78 (citing, inter alia, C.F.R. § 1208.18(a)(5); *Villegas*, 523 F.3d at 989). The majority then concludes that the BIA failed to consider Cole's claims that he would be tortured as a result of the *intentional* denial of medical care. Maj. Op. at 17977-78. Again, the majority misconstrues the record.

Although the majority does not specifically identify the relevant language in the BIA's decision related to Cole's denial of medical care claim, it appears to be referencing the BIA's statement that it "cannot conclude that the lack of medical

---

[9]The majority also appears to have concluded that because the BIA did not specifically refer to whether prison officials will *intentionally* subject Cole to dangerous conditions amounting to torture, the BIA failed to give adequate consideration to this contention. Maj. Op. at 17978, 17878 n.10. However, the BIA affirmed the IJ's decision and the IJ specifically found that Cole was "unable to show that Honduras has a *specific intent* to inflict suffering on prisoners or patients or suspected gang members by creating the conditions in their jails or medical facilities." In addition, there is evidence that the authorities are doing their best with limited resources to enforce the laws, even against police officers and prison officials.

treatment to the respondent is tantamount to torture." The majority interprets this as the BIA failing to specifically consider whether Cole would be *intentionally* denied health care. Maj. Op at 17978.

However, the majority overlooks the IJ's decision. *See Delgado*, 563 F.3d at 866. The BIA affirmed the IJ's determination that Cole was "unable to show that Honduras has a *specific intent* to inflict suffering on prisoners or patients or suspected gang members by creating the conditions in their jails or medical facilities." A review of the IJ's decision confirms that the IJ specifically rejected Cole's contention that he would be tortured as a result of intentional denial of medical care.

Furthermore, there appears to be but a single anecdote provided by Canales to support the contention that Cole may be intentionally denied medical care. Canales described an incident in which he witnessed staff at a hospital let a tattooed gang member that he had brought to the hospital bleed to death, allegedly on account of his gang tattoos. Maj. Op. at 17978. Even assuming that the events occurred as Canales described them, this is too slender a reed to compel the conclusion that Cole will more likely than not be intentionally denied medical care because of his gang tattoos. It is more than offset by the evidence in the 2008 Country Report of the efforts undertaken by the Honduran government to combat gangs and gang violence.

In sum, the BIA, in affirming the IJ's decision, agreed that Cole was "unable to show that Honduras has a *specific intent* to inflict suffering on prisoners or patients or suspected gang members by creating the conditions in their jails or medical facilities," and the evidence does not compel a contrary result.

**D**

While the majority is careful not to explicitly hold that being a tattooed gang member or tattooed ex-gang member is

a particular social group for the purposes of obtaining CAT relief, all of the harm that Cole will allegedly be exposed to is based on his being misidentified as belonging to a gang. The majority appears to assume that because Cole has gang tattoos, he is in effect like every tattooed gang suspect, gang member, or former gang member.

The majority's apparent acceptance of an undifferentiated class of tattooed gang members and tattooed former gang members as being eligible for CAT relief on account of their tattoos, appears to be contrary to our decision in *Arteaga*, 511 F.3d at 944. In *Arteaga*, in the context of a withholding of removal claim, we rejected the petitioner's contention that he was part of a particular social group based on his status as a tattooed gang member, gang member, or tattooed former gang member. *Id.* at 945-46. We stated:

> We cannot conclude that Congress, in offering refugee protection for individuals facing potential persecution through social group status, intended to include violent street gangs who assault people and who traffic in drugs and commit theft. Following in the analytical footsteps of President Lincoln, calling a street gang a "social group" as meant by our humane and accommodating law does not make it so. In fact, the outlaw group to which the petitioner belongs is best described as an "antisocial group[.]"

*Id.* at 945-46. Further,

> To do as Arteaga requests would be to pervert the manifest humanitarian purpose of the statute in question and to create a sanctuary for universal outlaws. Accordingly, we hold that participation in such activity is not fundamental to gang members' individual identities or consciences, and they are therefore ineligible for protection as members of a social group under 8 U.S.C. § 1231(b)(3).

*Id.* at 946. We also rejected Arteaga's claim that he belonged to a particular social group comprised of tattooed former gang members. *Id.* We stated, "Arteaga's attempt to present himself as a former member of a social group fares no better. Disassociating oneself from a group does not automatically put one in another group as group is meant in the law." *Id.*

Of course, relief under CAT is not dependant upon an individual being a part of a protected group, *see, e.g.*, *Kamalthas.*, 251 F.3d at 1283-84. Nonetheless, I cannot square the majority's concern for the harm Cole will allegedly be exposed to on being misidentified as belonging to a gang with our decision in *Arteaga*.

Moreover, I have grave doubts as to whether a tattoo, or at least Cole's tattoos, should form a basis for relief under CAT. A tattoo is not something that is innate to an individual or beyond his or her control. We have held that "tattooing is purely expressive activity, fully protected by the First Amendment." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1055 (9th Cir. 2010). Nonetheless, there are limits to speech under the First Amendment and even consequences to speech that is constitutionally protected. Furthermore, there seems to be no disagreement that tattoos are removable, even if this process may entail some pain.

Basing CAT relief on a tattoo would appear to encourage an individual who does not want to be deported to his home country to get a tattoo that is offensive in his home country (even if it is not necessarily offensive in the United States) and refuse to have it removed.[10] Would this lead an individual

___

[10]Judge Noonan's concurrence appears to misconceive Cole's desires. Cole does not want to return to Honduras. Accordingly, he has no incentive to remove his tattoos — which appear to be the thing delaying his removal to Honduras. Furthermore, it is doubtful that the BIA could force Cole to remove his tattoos. *See Anderson*, 621 F.3d at 1055.

Rather, on remand, the BIA might ascertain whether Cole has made any effort to remove his tattoos. If Cole has not removed his tattoos and

who did not want to return to China to obtain a Falun Gong tattoo? Would a prominent swastika tattoo compel CAT relief against repatriation to Israel?

Fortunately, this case does not present such extreme situations. Still, I would not grant CAT relief to an individual because of tattoos that allegedly may cause the individual to be misidentified as a member of a violent street gang which is disapproved of by the government.

## CONCLUSION

I disagree with the majority on several counts. First, the majority manufactures reasons to remand the case by mischaracterizing the BIA's decision and reweighing the evidence. Second, the majority concludes that remand is necessary because the BIA failed to give "reasoned consideration" to evidence that Cole may be tortured in Honduras by rival gangs, police or death squads, on account of his gang tattoos, when there is no compelling evidence of a likelihood of torture, and there is evidence that the government neither instigates nor acquiesces in torture by any of these groups. Third, the majority incorrectly asserts that remand is necessary because the BIA failed to consider whether Cole would be *intentionally* denied medical care rising to a level of torture. But the record shows that the BIA affirmed the IJ's factual determination that Cole would not be intentionally denied medical care, and that determination is adequately supported by the evidence. Finally, the majority's reliance on Cole's tattoos as a basis for relief under CAT is problematic and appears to be inconsistent with our decision in *Arteaga*, 511 F.3d 940, that gangs do not constitute particular social groups for immigration purposes. Because I believe the majority erred as to each of these matters, and because I find that the BIA's decision is supported by substantial evidence, I dissent.

---

declines to do so — and Cole is otherwise determined to be removable — the BIA should be free to remove him immediately, or possibly after a short period of time in which he could have the tattoos removed in the United States.